RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0235p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

CURTIS BELL, JR.,

*Defendant-Appellant.*

No. 13-2055

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:12-cr-00279-1—Paul Lewis Maloney, Chief District Judge.

Decided and Filed: September 12, 2014

Before: SUTTON and KETHLEDGE, Circuit Judges; ROSENTHAL, District Judge.[*]

───────────────

**COUNSEL**

───────────────

**ON BRIEF:** Christopher M. Gibbons, GIBBONS & BOER, PLC, Grand Rapids, Michigan, for Appellant. Sean C. Maltbie, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

───────────────

**OPINION**

───────────────

SUTTON, Circuit Judge. The question presented in this sentencing-enhancement case is this: Did Curtis Bell maintain a premises—his residence—for the purpose of manufacturing and distributing drugs? *See* U.S.S.G. § 2D1.1(b)(12). Here is the relevant evidence: Bell dealt crack

───────────

[*]The Honorable Lee H. Rosenthal, United States District Judge for the Southern District of Texas, sitting by designation.

cocaine for years and customarily cooked it in his kitchen; police found three police scanners, a digital scale, and drug-packaging materials in his home; and, after his arrest, police caught his ex-wife removing thousands of dollars in cash, packaged-to-sell crack cocaine, and guns from his house. The district court thought that these facts sufficed to impose a two-level enhancement under the sentencing guidelines. So do we.

In October 2012, police stopped Bell after receiving a tip that his car contained illegal firearms. They did not find any guns but they did find fifty-eight grams of crack, a few thousand dollars in cash, and a small quantity of marijuana inside his truck. The police arrested Bell.

Once in prison, Bell took advantage of his right to make a call. He called his ex-wife, Katrina, directing her to "get all the dirty clothes" from his house and telling her the combination to a safe in the house. R. 68 at 5. The jail recorded the phone call, as it does for all arrestees. Police soon found Katrina riding in a friend's car, and noticed that she was holding a laundry basket. In addition to pants and shirts, the basket contained twenty-nine small plastic bags of cocaine (totaling over 800 grams), two unregistered firearms, and $3,990 in cash—dirty clothes all. The drugs and guns came from Bell's truck parked in his garage, the cash from his safe inside. They also seized three police scanners, a digital scale, drug-packaging materials, and the safe from his home.

Authorities interviewed Katrina. Katrina and Bell apparently began living together sometime in 2008 or so. They married in late 2010 or 2011, separated one month later, divorced six months later, but continued living together anyway. From October 2011 until the summer of 2012, Katrina lived with Bell at the house in question. When she met Bell in 2004, he sold only marijuana, but in 2006 or 2007 she saw him with equipment to "cook" crack cocaine and with large amounts of cash. He would apparently cook in their home when they lived together. "[A]fter he was finished the house would be muggy from the boiling water," and the kitchen would be cluttered with items used in the process. R. 68 at 43. Katrina never directly observed Bell cooking and never participated in it, as she and their children always left first. Bell has not held a traditional job since January 2011.

Federal prosecutors charged Bell with a slew of drug crimes, 21 U.S.C. §§ 841 & 846, and with possessing firearms as a felon, 18 U.S.C. §§ 922 & 924. He pled guilty. At sentencing,

the district court applied a two-level enhancement for "maintain[ing] a premises for the purpose of manufacturing or distributing a controlled substance." U.S.S.G. § 2D1.1(b)(12). The scanners, scale, safe, cash, and firearms, the court reasoned, in addition to Katrina's statement and the absence of any other "alternative site for [the] cooking of drugs," warranted the enhancement. R. 81 at 27–28. The district court imposed a 144-month sentence.

Bell challenges the enhancement on appeal. Our circuit has not settled on the proper standard of review for assessing such enhancements. *Compare United States v. Jackson-Randolph*, 282 F.3d 369, 390 (6th Cir. 2002) (reviewing for clear error), *with United States v. Sweet*, 630 F.3d 477, 480 (6th Cir. 2011) (reviewing de novo). *See United States v. Vargas Gutierrez*, 464 F. App'x 492, 496 n.2 (6th Cir. 2012) (recognizing the conflict). The standard makes no difference here, as Bell loses either way.

Any defendant convicted of a federal drug crime who "maintained a premises for the purpose of manufacturing or distributing a controlled substance" is eligible for an enhanced sentence. U.S.S.G. § 2D1.1(b)(12). The enhancement applies to anyone who "(1) knowingly (2) opens or maintains any place (3) for the purpose of manufacturing or distributing a controlled substance." *United States v. Johnson*, 737 F.3d 444, 447 (6th Cir. 2013). Bell concedes that the evidence supports the first two elements.

As for the third element, the application note explains that a drug trade "need not be the sole purpose" for maintaining the place. U.S.S.G. § 2D1.1 cmt. n.17. It need only amount to a "primary or principal use[]," as opposed to an "incidental or collateral use[]." *Id.* Also important, the drug activity may occur in just a portion of a house, such as a "room" or "enclosure." *Id.*; *Johnson*, 737 F.3d at 447. We assess the primary or principal use of the home, or some part of it, by comparing the frequency of lawful to unlawful use. At bottom, the question is whether Bell's home "played a significant part" in distributing drugs. *See id*. at 449.

Bell's home did just that. From January 2011 to October 2012, Bell had no job other than cooking crack cocaine and selling it. He cooked the cocaine in the kitchen of his house. The house contained the "tools of the trade": a digital scale, drug-packaging materials, and police scanners. *Johnson*, 737 F.3d at 447–48. The home contained "a large sum of cash" in a safe—almost $4,000—at a time when Bell had no other employment. *See United States v.*

*$67,220*, 957 F.2d 280, 285 (6th Cir. 1992).　Then there are the guns and drugs inside Bell's truck, apparently the means by which Bell distributed the drugs.　Taken together, this evidence supports the enhancement.

Bell challenges the relevance of some of this evidence.　He notes, for example, that the scanners, scales, and drug-packing materials all have "legitimate purposes" that need not be tethered to the drug trade.　Appellant Br. at 19.　True enough—in the abstract.　But when these items are found together in the house of a known drug dealer, they take on a different hue, providing strong circumstantial evidence that he used the home to make and distribute crack cocaine.　Katrina's statement, he adds, did not spell out when, where, or how many times he cooked the cocaine in his kitchen.　True again.　But the statement still permits the incriminating inference that, when Bell sold crack cocaine, he cooked his own supply in the house.　As for the guns and the drugs that Katrina took from Bell's truck in his garage, he makes much of the fact that they were not in the house.　That Bell parked the delivery mechanism for his drug trade—a truck—in the garage rather than, say, in the kitchen does little to delink the enterprise from the house.　A garage first of all is part of a house; indeed, a drug trade run exclusively out of a garage would presumably qualify for the maintaining-a-premises enhancement.　No less importantly, the presence of the guns and drugs in the garage-parked truck confirmed the house-centered nature of the trade.　It is not much of an inferential leap to say that, if the house contained drug-distributing and drug-production items and if his car contained drugs, Bell used the house to cook and package the drugs.

In addition to attacking the relevance of this evidence, he attacks its sufficiency.　In two decisions affirming an enhancement under the guideline, he points out, the police found more drugs inside the premises than they found here and observed the defendant doing business there, something they did not see here.　*See Johnson*, 737 F.3d at 445–46; *United States v. Sanchez*, 710 F.3d 724, 725–26 (7th Cir.), *vacated on other grounds*, 134 S. Ct. 146 (2013).　What is sufficient is not always necessary.　"That [courts have] found some facts *sufficient* to establish the requisite significance . . . does not mean that those facts *necessarily* must be shown in every case."　*Johnson*, 737 F.3d at 448.　Drug storage on the property and transactions on the property

will usually suffice, but so too will a litany of circumstantial evidence showing drug production on the premises.  Just so here.

What of the reality that Bell lived full time in the house (his residence), suggesting that this perfectly lawful activity (residing there) was the primary purpose of it?  There is something to be said for this intuition, but neither the guideline, the application note, nor precedent supports it in this instance.

The guideline refers to "maintain[ing] a premises for the purpose of manufacturing or distributing a controlled substance."  U.S.S.G. § 2D1.1(b)(12).  One can maintain a premises for more than one purpose.  An individual may live there and maintain an office there.  An individual may live there and rent out a room or two there.  And an individual may live there and cook crack cocaine or methamphetamine there.  The guideline by its terms does not apply to buildings used *only* for drug production and distribution.  Nor was the language of the guideline pulled out of thin air.  It was based on a federal statute that criminalized the same conduct. 21 U.S.C. § 856(a) ("[I]t shall be unlawful to . . . knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance."); *see* Fair Sentencing Act of 2010, Pub. L. No. 111-220, § 6(2), 124 Stat. 2372, 2373 (directing the Sentencing Commission "to ensure an additional increase of at least 2 offense levels if . . . the defendant maintained an establishment for the manufacture or distribution of a controlled substance, as generally described in [21 U.S.C. § 856]").  No case to our knowledge has held that the *statute* does not apply to residences, where the activity of living there will invariably be the main, but not the only, purpose of the premises.  Court after court has applied the statute to drug production and distribution at residences.  *See, e.g.*, *United States v. Shetler*, 665 F.3d 1150, 1161–63 (9th Cir. 2011); *United States v. Russell*, 595 F.3d 633, 642–43 (6th Cir. 2010); *United States v. Church*, 970 F.2d 401, 405–06 (7th Cir. 1992).  The application note confirms this interpretation.  It requires only that drug activity constitute "*one of the* defendant's primary or principal *purposes*," not "*the sole* purpose," for maintaining the premises. *See* U.S.S.G. § 2D1.1 cmt. n.17 (emphasis added).  Living in a residence and cooking drugs in it can both be relevant purposes under the guideline.  Last of all, precedents under the guideline do not carve out residences as safe havens from being drug-production premises.  *See Johnson*, 737

F.3d at 449; *Sanchez*, 710 F.3d at 724; *United States v. Miller*, 698 F.3d 699, 706–07 (8th Cir. 2012).

For these reasons, we affirm.