**NOT RECOMMENDED FOR PUBLICATION**
**File Name: 20a0321n.06**

**No. 19-3377**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED**<br>Jun 03, 2020<br>DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| TROY DAVIS, | ) | THE NORTHERN DISTRICT OF |
| | ) | OHIO |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE: BOGGS, GRIFFIN, and LARSEN, Circuit Judges.

BOGGS, Circuit Judge. Troy Davis appeals two enhancements applied to his sentence on thirty-three counts related to a drug conspiracy: one enhancement for "maintain[ing] a premises for the purpose of . . . distributing" drugs, U.S.S.G. § 3B1.1(a), and another for being the "organizer or leader of a criminal activity that involved more than five participants . . . ." U.S.S.G. § 3B1.1(a). We readily affirm the premises enhancement—the evidence shows clearly that Davis was using his home as a central location in his drug dealing. The leadership enhancement is a closer question. For this enhancement to apply, the court must find that a defendant directed at least one other participant in the criminal scheme. Despite some initial problems, however, the district court did in fact make this finding. Therefore, we affirm this enhancement as well.

## FACTUAL AND PROCEDURAL HISTORY

Troy Davis ("Davis") dealt and distributed cocaine, cocaine base (crack), fentanyl, various fentanyl analogues, and heroin in Elyria, Ohio. Following an investigation that involved 45,000

recorded phone calls, the use of multiple criminal informants, controlled buys, and multiple arrests of Davis himself when he was carrying drugs, Davis and twenty-four confederates (several of whom were his cousins) were arrested and charged in a fifty-nine count indictment.[1] On November 14, 2018, Davis pled guilty without a plea agreement to the thirty-three counts in which he was charged. An uncontested portion of the record describes Davis's offense conduct as conspiring "to distribute 100 grams of Furanyl Fentanyl, 280 grams of cocaine base, 500 grams of cocaine, 100 grams of heroin, 40 grams of Fentanyl, and 10 grams of Carfentanil and various other types of Fentanyl."

After the Probation Office submitted its Presentence Investigation Report ("PSR"), Davis objected to both the organizer enhancement and the premises enhancement, as well as another enhancement that was dependent upon the organizer enhancement.[2] Davis also objected to three factual statements in the PSR: that another defendant, Fennell, had "sold 'for' Davis"; "that sources confirmed activities 'executed on behalf of' Davis"; and that Davis "has a large network of couriers, runners, and street traffickers[.]"

Davis's sentencing hearing was held on April 9, 2019. As described below, the proceedings were not a model of clarity. In the end, the district court found that the enhancements applied and, after making several other calculations not at issue in this appeal, sentenced Davis to 151 months in prison, which was at the highest end of the applicable advisory Guidelines range of 121 to 151 months. The government had argued, *inter alia*, that because some other members of the

---

[1] For clarity, we refer to Troy Davis as "Davis" and the other Davises who are involved in this case by their full names, e.g., "Elonzo Davis."

[2] This was a two-level enhancement under U.S.S.G. § 2D1.1(b)(16)(E) that applies when, provided the defendant has already been found to have had an aggravating role in the offense (here, an organizer or leader) under § 3B1.1, he is also found to have engaged in a pattern of criminal conduct as a livelihood.

conspiracy who were not as important as Davis would be receiving career-offender sentences due to their more extensive criminal histories, it was important that Davis be given a sentence at the top of the range to reflect his more senior role.

Davis timely appealed.

## STANDARD OF REVIEW

A claim that a district court improperly calculated the applicable guidelines range, including that it improperly applied a sentencing enhancement, presents a question of procedural reasonableness. *See United States v. Rayyan*, 885 F.3d 436, 440-41 (6th Cir. 2018). The government's underlying burden at sentencing is to "prove by a preponderance of the evidence that a particular sentencing enhancement applies." *United States v. Davis*, 924 F.3d 899, 902 (6th Cir. 2019). "The district court must provide a statement of reasons sufficient 'to satisfy the appellate court that [it] has considered the parties' arguments and has a reasoned basis for exercising [its] own legal decisionmaking authority.'" *United States v. Kamper*, 748 F.3d 728, 739 (6th Cir. 2014) (alterations in original) (quoting *Rita v. United States*, 551 U.S. 338, 356 (2007)).

Davis and the government disagree as to whether he preserved his claim of error as to the premises enhancement. If the claim was correctly preserved, we review the district court's factual findings for clear error and its legal conclusions *de novo*. *See Davis*, 924 F.3d at 902. We review unpreserved procedural-reasonableness claims, on the other hand, for plain error. *See United States v. Jackson*, 877 F.3d 231, 236 (6th Cir. 2017); *United States v. Gibbs*, 626 F.3d 344, 349 (6th Cir. 2010).

Davis undisputedly did preserve his claim of error as to the organizer enhancement. The application of an organizer or leader enhancement is subject to a special standard of review designed to reflect the reality that that the "trial judge is most familiar with the facts and is best

situated to determine whether someone is or is not a 'leader' of a conspiracy." *United States v. Washington*, 715 F.3d 975, 983 (6th Cir. 2013). Therefore, we review the district court's "legal conclusion that a person is an organizer or leader under § 3B1.1 deferentially, and its factual findings for clear error." *United States v. Sexton*, 894 F.3d 787, 794 (6th Cir. 2018) (cleaned up).

## ANALYSIS

This appeal raises two questions. Did the district court err in applying a four-level enhancement for being an "organizer or leader of a criminal activity that involved five or more participants," pursuant to U.S.S.G. § 3B1.1(a)?[3] And did the district court err by applying a two-level enhancement for "maintain[ing] a premises for the purpose of . . . distributing" drugs, pursuant to U.S.S.G. § 2D1.1(b)(12)? We examine each in turn.

### A. Organizer Enhancement

Section 3B1.1(a) of the Sentencing Guidelines provides for a four-level increase "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive . . . ." U.S.S.G. § 3B1.1(a). There is no doubt that the Elyria drug ring involved more than five people: as noted previously, twenty-four others were indicted with Davis. Two comments in the guidelines play a crucial role in understanding what, beyond this, is required for § 3B1.1(a) to apply. Comment four to § 3B1.1 reads, in pertinent part:

> In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree

---

[3] Upon this question depends another enhancement, under U.S.S.G. § 2D1.1(b)(16)(E). This applies when, if a defendant has already been found to have had an aggravating role in the offense (here, an organizer or leader) under § 3B1.1, he is also found to have engaged in a pattern of criminal conduct as a livelihood. There is no question that Davis engaged in a pattern of criminal conduct as a livelihood, so this enhancement will stand or fall based on the underlying organizer-or-leader enhancement.

> of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

U.S.S.G. § 3B1.1 cmt. n.4. "A district court need not find each factor in order to warrant an enhancement." *United States v. Castilla-Lugo*, 699 F.3d 454, 460 (6th Cir. 2012). Davis clearly qualifies as a leader or organizer under this comment. Davis was repeatedly described as the "hub" in a "hub-and-wheel-spoke-type conspiracy." In the Probation Office's response to Davis's objection to the leadership enhancement, the probation officer wrote that:

> The defendant's role as a leader included ordering supplies of drugs, discussing prices, cooking cocaine into crack, traveling out of state to pick up drugs for redistribution, taking sale orders from distributors, and operating several homes that were used specifically to manufacture and distribute drugs.

The court read this portion of the probation officer's response into the record at the sentencing hearing, and, with one exception, it is not challenged before us today.[4] This description of Davis's role tracks many of the factors in comment four—most notably, "the degree of participation in planning or organizing the offense . . . ." And as the district court found, Davis also played a significant role in recruitment.

But another comment, note two, creates a problem. This comment instructs that "[t]o qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor *of one or more other participants*." U.S.S.G. § 3B1.1 cmt. n.2 (emphasis added). The comment further makes it clear by implication that the enhancement does *not* apply to one who "exercised management responsibility over the property, assets, or activities of a criminal organization" but "did not organize, lead, manage, or supervise another participant[.]"

---

[4] The exception is the phrase regarding the "homes used . . . used specifically to manufacture and distribute drugs[,]" which goes to the premises sentencing enhancement. *See below*, Section III.B.

*Ibid.* We have repeatedly recognized, therefore, that "a defendant *must* have exerted control over at least one individual within a criminal organization for the enhancement of § 3B1.1 to be warranted." *United States v. Gort-DiDonato*, 109 F.3d 318, 321 (6th Cir. 1997) (emphasis added); *see, e.g.*, *United States v. Vandeberg*, 201 F.3d 805, 811 (6th Cir. 2000) (same); *United States v. Kamper*, 748 F.3d 728, 748 (same); *United States v. Turner*, 738 F. App'x 856, 861 (6th Cir. 2018) (same).

Davis contended at the sentencing hearing that although he had "occup[ied] an important role in . . . this conspiracy[,]" he had not exercised control over anyone else. Instead, he characterized his coconspirators "as independent contractors," by pointing to the government's own description of the conspiracy. As the AUSA put it, this was "a hub-and-wheel-spoke-type conspiracy as opposed to a pyramid structure. The center of the hub and wheel is Mr. Davis." The other participants relied on Davis to use "[his] connections to . . . suppliers in order to get his drugs." Notably, in dealing with the other participants, Davis did not, the government acknowledged, take an authoritarian tone:

> I'll concede Mr. Thompson's point that these are not the type of calls where he's saying, "Hey, you, do this," or "Hey, you, do that." This is a much more nuanced argument where it requires basically Mr. Davis to just do what he does and network and make connections so that these low-level, mid-level distributors who are on the street, who sometimes are often trying to buy drugs for themselves from Mr. Davis, are relying on his network and connections to then procure the larger amounts of drugs.

Similarly, at another point the AUSA said that:

> [Davis i]s explaining, *not the type of direction maybe I would give a subordinate*, but the type of direction saying, "Hey, Mr. Hobson, you know, I can't get to do X, Y or Z, so I need your assistance in making this transaction happen."

(Emphasis added.) These descriptions enabled Davis to argue, below and on appeal, that the conspiracy consisted of buyer-seller relationships, which are insufficient grounds for the leadership enhancement.

As we shall see, there was sufficient evidence to contradict this characterization and show that Davis, in fact, had directed other participants. However, there was delay and confusion in discussing this evidence at sentencing because both the prosecutor and the court were not always clear as to the requirements for applying U.S.S.G § 3B1.1. The AUSA extensively analyzed Davis's behavior in terms of a comment to U.S.S.G § 3B1.2 (concerning mitigating-role reductions) rather than § 3B1.1.[5] More concerning, the court itself was unsure whether it needed to find that Davis had directed another participant in order to apply the organizer enhancement. At a crucial moment, the defense attorney pointed out to the court that "[s]upplier and manager/leader are different" and clarified that he was arguing that Davis was a supplier but not a manager/leader. The court responded, in part, that: "Without his source of drugs, those folks who are the spokes aren't obtaining the drugs. That's another description of a leader of a criminal drug conspiracy." Similarly, the court noted that in sentencing Davis's codefendants, it had seen each of them identify Davis as the leader of the conspiracy–but then, minutes later, rephrased that statement as "almost each one of them identifies Mr. Davis as the primary supplier."

---

[5] Section 3B1.2 details offense-level reductions to be granted in recognition of a defendant's lesser responsibility ("Mitigating Role") in the criminal enterprise, just as § 3B1.1 concerns enhancements for more significant participation, e.g. as an organizer or leader ("Aggravating Role"). Therefore, the factors to be considered in many ways mirror one another: e.g., both comment 4 to § 3B1.1 and comment 3(C) to § 3B1.2 require the court to consider the defendant's decision-making authority. As a result, the discussion yielded facts and analysis that could be applied to the question that was actually before the court. Nevertheless, the extensive discussion of the wrong standard is troubling.

Davis's attorney repeatedly returned the discussion to the threshold requirement for the enhancement. Due to this, the court finally ruled that Davis had indeed "exerted control" over another participant:

> [J]ust today I've heard exerting control. "Get the drugs from your son. I'm not giving Shorty any more dope." That's an exertion of control. The withholding of supply is an exertion of control. And that's just what I'm recalling from what I've heard in the last 15 minutes.

The court here appears to be referring to two different incidents that had recently been described.

The first was the prosecutor's statement, a few minutes before, that:

> In paragraph 320, Your Honor, Mr. Davis again instructs Alvin Fennell when he asks for some drugs, Mr. Davis says, "Call your son." In other words, I just gave Alkeem Fennell some drugs. If you're looking for those, talk to him, don't talk to me, I'm busy right now or can't otherwise fulfill this sale.

Paragraph 320 of the indictment indeed reads:

> On or about February 4, 2018, at approximately 6:45 p.m., TROY DAVIS received an incoming text message from ALVIN FENNELL on the telephone. The text message says, "I need a gram (of cocaine) I got the money." At approximately 9:34 p.m., TROY DAVIS received an incoming call from ALVIN FENNELL on the telephone. During the conversation, ALVIN FENNELL said, "I need two of them." TROY DAVIS said, "Call your son (ALKEEM FENNELL)." [6]

This, then, is what the court meant by "Get the drugs from your son." The next phrase, "I'm not giving Shorty any more dope," appears to refer to a separate incident, recited in paragraph 171 of the indictment, in which Davis declared that, "I'm not giving Shorty [William Solomon] no drugs," because Solomon had mishandled a previous supply.[7]

---

[6] [The indictment appears to use parentheses where standard usage would have brackets.]

[7] Paragraph 171 of the indictment gives the complete story:

> On or about November 27, 2017, at approximately 12:22 p.m., TROY DAVIS called WASHINGTON, who stated, "I'm not even helping Shorty (WILLIAM SOLOMON). I'm not giving Shorty no drugs." TROY DAVIS responded, "Right." WASHINGTON stated, "He ain't getting no more drugs out of me... I'm like, I'll help Shorty a different way, but I ain't giving that ni**a no more drugs to f**k up." Later in the conversation, TROY DAVIS stated, "I said 'cuz.'

The court and the defense attorney engaged in a colloquy over whether "[t]he withholding of supply is an exertion of control." Davis's attorney argued that such a holding would turn every supplier relationship into an event that would qualify for a leadership enhancement. The court countered that, in circumstances that are not those of a legitimate market, denial of an expected supply is in fact a form of control, because the person expecting the supply has no other options. That debate continues on appeal.

> The court then summarized its conclusion:
>
> It makes no sense, this co-op of drug dealing scenario that you suggest. Like everybody's just in a commonplace on Bell Street and having access to drugs without anybody being in control.
>
> Whether it's a gentle or firm form of control, Mr. Troy Davis was in control. Whether he was a good organizer or not, I don't know.

The district court thus found that Davis was an organizer or leader and overruled his objection to the four-point enhancement.

Davis also objected to several specific factual statements in the PSR that had a bearing on his leadership role. Most notably, the district court proceeded to Davis's objection to the PSR's "conclusion that Fennell sold 'for' Davis." The probation officer's reply, which the court noted, stated: "According to the case agents, Fennell sold drugs for the defendant. The agents indicated

---

I said, 'that's a lie!' I said 'because me and Miko (WASHINGTON) gave you a couple of them things together, Bro. The same day, my ni**a. The same day, Bro! You keep...." WASHINGTON responded, "Hell no, I ain't giving him s**t. I gave the ni**a a nine pack (nine ounces of cocaine)! ... Joey stepped up and gave him some ... them ni**as gave him somethin'." TROY DAVIS stated, "Listen, but me and you had got that s**t that one day, Bro. I gave him one, you gave him one. You remember that s**t, cuz? I gave him a whole one (an additional nine ounces)! ... You gave him one, Bro." WASHINGTON then responded, "And I gave, and I gave him, and I gave him something after that." TROY DAVIS stated, "And then he f***ed that up! ... Ni**as giving you nine packs, you f**king it up, ni**a. Ain't the first one, He ain't the only one to give you one! Somebody else give you one too and you f**k it up!"

(Ellipses and alterations in original.)

that Fennell worked directly for Davis, and this was supported by monitored phone calls that occurred between Fennell and Davis." The court overruled Davis's objection to the statement.

Similarly, Davis had objected "to the conclusion that sources confirmed activities 'executed on behalf of' Davis." Again quoting from the probation officer's response, the court said:

> "Case agents utilized confidential sources of information to purchase drugs and provide information. Information received from those sources assisted law enforcement in confirming that other coconspirators were acting on the direction of the defendant, Mr. Troy Davis. This was also supported by monitored phone calls that occurred between the defendant and the coconspirators."
>
> Mr. Thompson [defense attorney], this might collide with your theory of Mr. Davis's involvement, but I find it credible and representative of Mr. Davis's role in the offense. I overrule the objection.

In context, "your theory of Mr. Davis's involvement" refers back to the earlier debate over the organizer enhancement. When the district court overruled the objection, it found that Davis did give "direction" to other coconspirators. Had the court articulated this determination before applying the organizer enhancement, it would clearly have been enough to satisfy the *Gort-DiDonato* requirement that the defendant had "exert[ed] control over at least one person." 109 F.3d at 318. As it was, the court was speaking *after* it had already made its ruling on the organizer enhancement, in the context of a different objection (albeit one that surely was made because it bore directly upon the organizer issue). But both objections were raised in the papers before the hearing started. It is reasonable to take the court's awareness of these facts into account when assessing its evaluation of the organizer enhancement.

On the other hand, in the face of Davis's objection to the PSR's statement that he "had a large network of couriers, runners, and street traffickers," the government agreed to modify it to

"had access to" in order to reflect "nuance." This ended all discussion of the objections bearing factually or legally on the organizer enhancement.

We find this a close call, but we affirm the district court's application of the organizer enhancement. This is not a case, as in *Kamper* or *McDonald*, where the district court failed to actually make the finding that Davis supervised one or more people. *See Kamper*, 748 F.3d at 748 ("[T]he district court erred because it failed to make a factual finding that Head managed or supervised other individuals involved in the conspiracy."); *United States v. McDonald*, 800 F. App'x 364, 368 (6th Cir. 2020). Rather, despite the detours along the way, the district court did find that Davis supervised at least one person and that the enhancement otherwise applied.

Davis stresses that "a mere buyer-seller relationship does not make one of the participants a leader/organizer . . . even if one of them fronts drugs to the other[.]" *McDonald*, 800 F. App'x at 367. Similarly, Davis's attorney argued at sentencing that Davis's coconspirators "were acting as independent contractors." In particular, he argued that when Davis told Fennell senior to get his drugs from Fennell junior, it was like a vendor redirecting a customer to another supplier. But this is unconvincing. The Fennell exchange does not have the air of a shop owner who is out of an item referring a potential customer to a competitor to retain goodwill. Rather, it smacks of a busy shop owner referring the customer *to his employee*, who will look after his needs. Similarly, a dealer refusing to sell to someone might, in the abstract, be evidence of a buyer-seller relationship—but here, in the context of an ongoing network that depended on Davis to keep everything moving, Davis's refusal to give "Shorty" any more drugs is more akin to terminating (or suspending) an employee. Each, then, is evidence that Davis exerted control over another conspirator.

Moreover, as we have seen, the district court made four different factual findings that support the organizer enhancement: two in the colloquy with Davis's lawyer (cutting off "Shorty"

11

from his supply and directing Fennell senior to Fennell junior for drugs) and two in overruling the factual objections to the PSR (that "Fennell sold 'for' Davis" and that drug conspiracy activities were "executed on behalf of" Davis). Together they add up to a picture of pervasive if polite control of the drug ring. In sum, the court made sufficient factual findings that show Davis directed one or more members of the conspiracy and, thus, qualified for the enhancement.

Finally, we recall that the standard for a leadership enhancement is uniquely deferential. To reflect the reality that the "trial judge is most familiar with the facts and is best situated to determine whether someone is or is not a 'leader' of a conspiracy," *Washington*, 715 F.3d at 983 we review even the district court's "*legal* conclusion that a person is an organizer or leader under § 3B1.1 deferentially . . . ." *Sexton*, 894 F.3d at 794 (emphasis added). Here, the district court was overseeing not only Davis's case but those of his co-conspirators. There is good reason, therefore, to be confident in its grasp of the dynamics of this drug ring—which is exactly what the standard of review is designed to reflect. Other, uncontested evidence makes it clear that Davis qualified under comment four for the organizer enhancement, so long as it can be shown under comment two that he directed at least one other participant. Given that the district court eventually acknowledged the need to find that Davis had exerted control over another participant, and pointed to two pieces of evidence that he had in fact done so—combined with its experience sentencing all the other participants—the "deferential[]" standard of review leads us to affirm.[8]

### B. Premises Enhancement

The government and Davis disagree over the standard of review that ought to apply to Davis's objection to the premises enhancement. The government contends that Davis's objections

---

[8] For the foregoing reasons, we also uphold the enhancement under U.S.S.G. § 2D1.1(b)(16)(E).

were insufficiently specific as to the issue he raises on appeal. "If defense counsel does not object

with a reasonable degree of specificity to a purported procedural error, a plain error standard of

review applies." *Gibbs*, 626 F.3d at 349; *see also United States v. Bostic*, 371 F.3d 865, 871 (6th

Cir. 2004). But even assuming Davis is correct regarding the standard of review, he still cannot

prevail. Davis's argument regarding the premises enhancement focuses on one specific statement

by the prosecution at the sentencing hearing:

> THE COURT: The guidelines suggest also how frequently the premises were used
> for manufacturing or distributing [is an important consideration for application of
> this enhancement]. During the length of your investigation, how frequently would
> you say -- you use what measure you'd like, but how frequently would you say that
> it was evident to your investigators that the defendant was dealing from the 360
> High Street address?
>
> MS. DARDEN [AUSA]: Daily, Your Honor.

Davis argues that the district court committed a factual error "by relying on the government's

unsupported claim" that he dealt drugs "daily" from his home.

Section 2D1.1(b)(12) provides for a two-level enhancement "[i]f the defendant maintained

a premises for the purpose of manufacturing or distributing a controlled substance[.]" The

application note specifies that:

> Manufacturing or distributing a controlled substance need not be the sole purpose
> for which the premises was maintained, but must be one of the defendant's primary
> or principal uses for the premises, rather than one of the defendant's incidental or
> collateral uses for the premises. In making this determination, the court should
> consider how frequently the premises was used by the defendant for manufacturing
> or distributing a controlled substance and how frequently the premises was used by
> the defendant for lawful purposes

U.S.S.G. § 2D1.1 cmt. n.17. The insuperable problem for Davis is that the record is replete with

evidence from which the court could, by a preponderance of the evidence, find that he did in fact

deal drugs daily from his home. Paragraph 173 of the indictment tells how, in response to a request

13

to buy cocaine, Davis responded, "Yeah, you know where I'm at. Just come to my house." Similarly, just after midnight one night, Davis responded to a request to buy cocaine with "K let me no when u outside." And one incident in the indictment suggested Davis's methods for running his trade out of his house with greater specificity:

> On or about December 1, 2017, at approximately 1:04 p.m., TROY DAVIS made an outgoing phone call to WASHINGTON. During the conversation, TROY DAVIS stated, "I'm home." WASHINGTON replied, "Go out the back door, look by that oil can... look by that oil jug, inside that box." TROY DAVIS stated, "Oh, I see it." WASHINGTON stated, "It had them goodies in that box." TROY DAVIS said, "Alright."

As the AUSA told the court, investigators later confirmed that the arrangements described in the conversation conformed to the description of Davis's house. That Davis was using his porch as a mailbox for his drug-dealing operation is further confirmed by the fact that at another point in the indictment, Davis complains that someone "[c]ame on my back porch and stole nine thousand dollars' worth of my s**t (drugs), man." Probably not coincidentally, a police source at one point estimated that Davis made about $8,000 a day dealing drugs. The inference would seem clear that he used his porch to facilitate such dealing while maintaining some plausible deniability, and that one time this had the unfortunate result of leaving him vulnerable to other criminals.

The prosecution catalogued these incidents for the district court at sentencing. The AUSA also directed the court to U.S.S.G. § 2D1.1 cmt. n.17, which instructs that:

> Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises. In making this determination, the court should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes.

U.S.S.G. § 2D1.1 cmt. n.17. The AUSA then argued that:

14

> [W]e know that Mr. Davis didn't have any other source of income. So his primary use of that home day in and day out, if he wasn't sleeping there or otherwise entertaining his family, was to use it for the purpose of selling drugs

This argument tracks language from our cases. In *Bell*, for instance, we observed: "From January 2011 to October 2012, Bell had no job other than cooking crack cocaine and selling it. He cooked the cocaine in the kitchen of his house." *United States v. Bell*, 766 F.3d 634, 637 (6th Cir. 2014). We held that the enhancement applied. *Id.* at 638. More broadly, in *Bell* we recognized the reality that defendants often *will* both live in and conduct drug business from their homes. *Ibid.* As long as both purposes can reasonably be characterized as "*one of the* defendant's primary or principle *purposes*," the enhancement still applies. *Ibid.* (quoting U.S.S.G. § 2D1.1 cmt. n.17 (emphasis added)); *see also United States v. Hagan*, 766 F. App'x 356, 359 (6th Cir. 2019) ("The more the home looks like a business[,]" the more likely the enhancement is to apply.).

Davis attempts to argue that the incidents in the indictment to which the AUSA adverted were "insufficient" to show that Davis's drug dealing was a primary purpose for maintaining his home, and that the court instead erroneously relied on the AUSA's characterization that he did so "daily," which (Davis further argues) is not evidence. But this is unpersuasive. These incidents from the indictment give ample reason to infer that Davis *routinely* operated in such a manner. And the court did not ask the AUSA to give testimony; it asked the AUSA to summarize the findings of the investigators. ("[H]ow frequently would you say that it was evident *to your investigators* that the defendant was dealing from the 360 High Street address?" (Emphasis added.)) Meanwhile, the meaning of the "purpose" language in the sentencing guidelines has long been settled by our decisions. Under these decisions, Davis clearly fits the requirements for such an enhancement.

The two cases on which Davis relies are unavailing. Davis argues primarily that "an attorney's assertions are not evidence[,]" citing *United States v. Webb*, 616 F.3d 605, 610 (6th Cir. 2010). *Webb* concerned a counterfeiter who, inter alia, wished to argue that a confession he had given to the Secret Service was unreliable for sentencing purposes because he was drunk at the time he gave it. *Id.* at 608. But the only grounds for believing that this was true—i.e., that he really had been drunk—was his attorney's statement at sentencing. And an attorney's statement is not evidence, as the court observed in weighing whether the enhancement should apply. *Id.* at 610. This is very different than saying that a court cannot consider an attorney's characterization of the record at sentencing, which is what Davis needs to argue here. Unlike in Webb's case, where there was no underlying evidence that Webb had been drunk, here there was ample evidence that Davis had used his house daily for drug dealing.

The second case Davis cites, *United States v. Whiteside*, 747 F. App'x 387 (6th Cir. 2018), contradicts his argument. He cites it for the proposition that, "[p]roof of one drug transaction inside the home and another drug transaction on the street nearby, *without more*, does not sufficiently establish that drug activity was a primary use of the premises." *Id.* at 395 (emphasis added). But here we have far more than "[p]roof of one drug transaction inside the home." *Id.* As we have seen, the record is replete with proof of *many* drug transactions within the home. Thus there is "more," which militates toward a finding that the premises enhancement should apply.

Therefore, no matter the standard of review, we cannot say that the district court erred in accepting that Davis dealt drugs "daily" from his home. We accordingly uphold the premises enhancement.

## CONCLUSION

For the foregoing reasons, the sentence imposed by the district court is AFFIRMED.

16