NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0213n.06

Case No. 23-1945

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

FILED

May 10, 2024
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| LESTER CHARLES STOKES, aka Jay | ) | MICHIGAN |
| Lester-Charles Stokes, | ) | |
| | ) | |
| Defendant-Appellant. | ) | OPINION |
| | ) | |

Before: BATCHELDER, THAPAR, and MATHIS, Circuit Judges.

THAPAR, Circuit Judge. Lester Stokes pled guilty to drug trafficking. He now challenges the application of a two-level sentencing enhancement for maintaining a drug-distribution premises. Because ample evidence supported the enhancement, we affirm.

While Stokes was on supervised release for drug and firearm offenses, law enforcement officers received multiple tips that he was dealing drugs from a house on Massachusetts Avenue. Police confirmed Stokes's dealing through three controlled buys. In each, Stokes drove to the transaction from the Massachusetts Avenue house in a black Chevy Impala. Police also placed a GPS tracker on the Impala, which showed that Stokes spent most of his time at the Massachusetts Avenue residence.

Based on this information, police secured a warrant to search the house. They found contraband throughout. From the kitchen, police recovered cocaine (657 grams),

methamphetamine (405 grams), psilocybin or "magic mushrooms" (28 grams), fentanyl (2 grams), a bin full of marijuana, hundreds of unidentified blue pills, drug-packaging equipment, and two digital scales covered in drug residue. In the bedroom closet, Stokes kept a loaded pistol and an AR-style rifle next to a loaded magazine. In the bedroom dresser, he had stashed wads of cash totaling $10,600, including several marked bills from the controlled buys. And in the garage and basement, Stokes stored more fentanyl (23 grams), several bags of marijuana, and multiple boxes of ammunition. Police also discovered evidence that Stokes lived at the house, such as family photos on the dresser, men's clothing in the bedroom closet, his Michigan ID on the nightstand, and packages addressed to Stokes throughout the house.

The same day, police arrested Stokes as he was leaving the Massachusetts Avenue residence. In his pocket, Stokes had a wad of cash with more of the marked bills. And in his underwear, he had methamphetamine (13 grams), cocaine (30 grams), and fifty-one blue pills— all in smaller, distribution-ready baggies. Once in jail, Stokes was allowed a customary phone call, which the jail customarily recorded. *Cf. United States v. Bell*, 766 F.3d 634, 636 (6th Cir. 2014). On the call, Stokes told his girlfriend to check if police had found the dresser money, explained where he'd hidden other guns and drugs, and directed her to sell them.

Stokes pled guilty to possessing drugs with the intent to distribute. *See* 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(ii), 841(b)(1)(B)(viii). The district court enhanced Stokes's Guidelines range after finding he "maintained a premises for the purpose of manufacturing or distributing a controlled substance." U.S.S.G. § 2D1.1(b)(12). The district court then sentenced Stokes at the bottom of the enhanced range, to 168 months in prison.

On appeal, Stokes claims the court should not have enhanced his Guidelines range. He doesn't dispute that he used the Massachusetts Avenue house to store and deal drugs. Instead, he

argues (1) he didn't maintain the house, and (2) even if he did, drug distribution wasn't a predominate purpose. Both arguments fall short.

*Maintenance.* The government produced a wealth of evidence that Stokes "maintained" the Massachusetts Avenue residence. Most importantly, Stokes's personal belongings were scattered throughout the house, and GPS data indicated he rarely strayed far. This strongly suggests he lived there. And when "the defendant lives in the house," maintenance is "easily proved." *United States v. Johnson*, 737 F.3d 444, 447 (6th Cir. 2013) (quotation omitted). That's because people typically control access to and activities at—i.e., "maintain"—the place where they live. *See* U.S.S.G. § 2D1.1 cmt. n.17. Stokes certainly did. He stored large quantities of drugs, drug proceeds, and drug paraphernalia on every floor. *See Johnson*, 737 F.3d at 447 (treating storage as indicative of control); *United States v. Jackson*, No. 22-3164, 2024 WL 751571, at *2 (6th Cir. Feb. 23, 2024) (same). He also took responsibility to protect the home, keeping two firearms in the bedroom. *United States v. Russell*, 595 F.3d 633, 645 (6th Cir. 2010). And even after his arrest, Stokes continued to supervise the premises, directing his girlfriend to look for drug money he hid in the bedroom. *Id.*; *accord* U.S.S.G. § 2D1.1 cmt. n.17. Put simply, Stokes was "more than just a casual visitor." *United States v. Taylor*, 85 F.4th 386, 390 (6th Cir. 2023) (quotation omitted). He lived at the house, protected the house, and exerted control over items stored at the house.

In response, Stokes points out that only his girlfriend signed the lease, while he listed his legal address as his grandmother's house. But a defendant need not formally rent or own a home to satisfy the enhancement's maintenance element. *Russell*, 595 F.3d at 644; *Taylor*, 85 F.4th at 389–90. Nor is it surprising that Stokes told his probation officer he lived elsewhere. After all, Stokes was trafficking drugs from Massachusetts Avenue—a fact he hoped to hide from law

enforcement. *Cf. United States v. Cannon*, 552 F. App'x 512, 516 (6th Cir. 2014) ("Drug kingpins are not known for signing leases for their drug houses."). Thus, the district court correctly determined that Stokes maintained the house.

*Purpose*. But did Stokes maintain it for the "purpose" of distributing drugs? To meet this prong, the house must have "played a significant part in distributing drugs." *Bell*, 766 F.3d at 637 (quotation omitted). It did. Police witnessed Stokes use Massachusetts Avenue as the starting point for three drug deals, and they stopped a likely fourth in progress. *See* U.S.S.G § 2D1.1 cmt. n.17 (considering distribution frequency). Stokes says three or four controlled sales over a few months isn't all that many. *But see United States v. Broadnax*, 777 F. App'x 137, 142 (6th Cir. 2019) (four transactions). But those are just the deals law enforcement caught. The volume of drugs and drug proceeds found in the home suggest the observed transactions were the "tip of the iceberg." *See United States v. Terry*, 83 F.4th 1039, 1043 (6th Cir. 2023).

Regardless, in addition to Stokes's distribution frequency, we also evaluate the extent to which Stokes used Massachusetts Avenue "to advance" his drug trafficking. *Johnson*, 737 F.3d at 448. That includes "stor[ing] a controlled substance for the purpose of distribution." U.S.S.G § 2D1.1 cmt. n.17. Here, Stokes processed, packaged, and stored distribution-level quantities of drugs at the Massachusetts Avenue residence. And the presence of various tools of the trade—like scales, packaging equipment, cash, guns, and ammunition—confirms that Stokes planned to sell the drugs, just as police had seen him do thrice before. *See Johnson*, 737 F.3d at 447–48; *Bell*, 766 F.3d at 637; *United States v. Heard*, No. 23-1225, 2024 WL 1049480, at *5 (6th Cir. Mar. 11, 2024). Accordingly, the district court correctly determined that the premises played a significant part in Stokes's drug-trafficking scheme.

We affirm.