RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0229p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

No. 22-1961

MICHAEL DOMINIQUE TERRY, JR.,

*Defendant-Appellant*.

───────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:21-cr-00153-6—Paul Lewis Maloney, District Judge.

Argued:  July 27, 2023

Decided and Filed:  October 13, 2023

Before:  MOORE, ROGERS, and GRIFFIN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Joshua A. Blanchard, BLANCHARD LAW, Greenville, Michigan, for Appellant.
Lauren F. Biksacky, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for
Appellee.  **ON BRIEF:**  Joshua A. Blanchard, BLANCHARD LAW, Greenville, Michigan, for
Appellant.   Theodore  J.  Greeley,  UNITED  STATES  ATTORNEY'S  OFFICE,  Marquette,
Michigan, for Appellee.

        ROGERS, J., delivered the opinion of the court in which GRIFFIN, J., joined.  MOORE,
J. (pp. 10–14), delivered a separate dissenting opinion.

———————————

## OPINION

———————————

ROGERS, Circuit Judge.  Defendant Michael Terry pleaded guilty to four counts of distributing a mixture containing fentanyl and was sentenced to fifty-seven months of imprisonment.  In this appeal, he challenges only the district court's imposition of the U.S. Sentencing Guidelines' "drug house" two-point enhancement for maintaining a premises for the purpose of manufacturing or distributing a controlled substance.  U.S.S.G. § 2D1.1(b)(12). He argues that there was not sufficient evidence that a primary use of his residence was for the distribution of controlled substances.  On the evidence that Terry and his co-conspirator engaged in repeated drug dealing from Terry's home, the district court properly applied the enhancement.

Between the summers of 2020 and 2021, large quantities of fentanyl flowed through Lansing, Michigan.  An investigation uncovered a conspiracy as its source.  The conspiracy's head, Edward Washington, was Terry's cousin.  Surveillance, controlled purchases of fentanyl, and authorized wire intercepts, among other evidence, revealed Terry's participation in his relation's drug distribution scheme.

Most relevant to this appeal, Terry's Smith Street residence supplied a place for conspiracy-related activities.  Terry sold fentanyl from the address and permitted Washington to use his property for drug distribution.

Terry was tried with other co-conspirators and pleaded guilty to four counts of distribution of a mixture or substance containing a detectable amount of fentanyl.  21 U.S.C. §§ 841(a)(1), (b)(1)(C).  The district court found Terry's offense level to be 21, which, when paired with his criminal history of III, resulted in an advisory Guidelines range of 46 to 57 months.  The court sentenced Terry to 57 months' imprisonment, at the high end of the range. The offense level of 21 included the court's application of a two-level enhancement for having "maintained a premises for the purpose of manufacturing or distributing a controlled substance." U.S.S.G. § 2D1.1(b)(12).  If the court had not applied the two-level enhancement, the Guidelines

range would have been 37 to 46 months.  Terry now appeals, challenging only the applicability of the two-level enhancement.

The two-level "drug house" enhancement applied in this case because, in the words of the guideline, Terry "maintained a premises for the purpose of manufacturing or distributing a controlled substance." *Id.*  On appeal, Terry makes the seemingly single argument that there was no evidence that "a primary use of the residence was for the distribution of controlled substances."  The argument, however, has both a factual component (what does the evidence actually show about primary use) and a legal one (what kind of evidence about primary use is required by the guideline).

Formally, as both parties point out in their briefs, courts reviewing the application of a sentencing guideline to a factual determination generally review factual issues deferentially for whether there is clear error on the part of the lower court, but review legal issues de novo, which is to say without deference to the lower court.  *See United States v. Tolbert*, 668 F.3d 798, 800 (6th Cir. 2012); *United States v. Parrish*, 915 F.3d 1043, 1047 (6th Cir. 2019).  A perhaps simplistic way to think about the difference between a factual and a legal issue is that we get the answer to the factual issue by resort to the record, while we get the answer to a legal issue by resort to the lawbooks.  To be sure, a "single" question for review can require both an examination of the record and resort to the lawbooks.  For example, the single question "is Lee old enough to vote" is really more than one question, including "how old is Lee" (fact) and "what is the minimum age to vote" (law).  That is often easy to tease out, but it is not always so easy, especially when a general legal term that can be interpreted multiple ways is applied to a range of different factual possibilities.

What happens then is that courts may apply a type of hybrid approach.  *See generally United States v. Abdalla*, 972 F.3d 838, 850–51 (6th Cir. 2020).  In the sentencing context in particular, the Supreme Court has held that a "deferential review [is] appropriate" where "[t]he legal question at issue [was] a minor, detailed, interstitial question of sentencing law, buried in a judicial interpretation of an application note to a Sentencing Guideline" as opposed to "a generally recurring, purely legal matter, such as interpreting a set of legal words."  *Buford v. United States*, 532 U.S. 59, 64–65 (2001).  We have applied *Buford*'s reasoning in the drug-

house-enhancement context. *See United States v. Uminn*, 820 F. App'x 353, 356 (6th Cir. 2020). In contrast, when our analysis focused entirely on comparing accepted facts in the case before us with the facts of various precedents, we have applied fresh review. *See United States v. Rich*, 14 F.4th 489, 495 (6th Cir. 2021); *see also United States v. Sweet*, 630 F.3d 477, 480, 482 (6th Cir. 2011) (applying fresh review in the context of obstruction-of-justice sentencing enhancements).

In this case, we do not need to examine the precise contours of appellate review of highly fact-intensive legal issues, because, as in the voting-age example, it is not difficult to rule in this case first by finding no clear error with respect to the relevant facts, and then determining independently that on those facts the district court did not legally err.

In rejecting Terry's objection to the drug house enhancement, the district court adopted the facts in the pre-sentence report. The district court stated that on the issue of the drug premises, "in the Court's judgment, the government's argument as related to the facts which justify the enhancement, are spot on correct, based on the Court's review of the presentence report." The final pre-sentence report, in turn, lists the following activities involving Terry's residence:

| | |
|---|---|
| 12/9/20 | controlled purchase of 0.19 grams of fentanyl from Terry at Terry's residence. |
| 1/21/21 | controlled purchase of 0.46 grams of fentanyl from Terry at Terry's residence. |
| 2/18/21 | controlled purchase of 1.26 grams of fentanyl or methamphetamine from Terry and Washington at Terry's residence. |
| 2/23/21 | controlled purchase of 1.11 grams of fentanyl from Terry and Washington at Terry's residence. |
| 4/18/21 | Washington and another co-conspirator discussed a planned purchase of 50 grams of heroin before meeting at Terry's residence. |
| 5/6/21 | Washington distributed an unknown amount of narcotics to another co-conspirator at Terry's residence. |
| 5/28/21 | Washington and Terry engaged in a transaction involving 10 grams of heroin at Terry's residence. |

On the basis of this evidence of activity at Terry's residence in five months, the district court concluded:

> First, a confidential informant conducted multiple controlled buys from the defendant at that residence. Second, Washington conducted multiple distribution[s of] . . . narcotics at that residence. The continuation of the criminal complaint includes two instances where, based on officer training and experience, Washington conducted deals at the defendant's residence or outside of the residence with defendant present at the residence.

None of this has been factually refuted by Terry. In any event, it was supported by the evidence.

For his part, Terry agrees that he maintained the premises in question as his residence. He also explains that "no drugs were ever recovered from the house, there is no evidence that Mr. Terry cooked, manufactured, or packaged drugs there, no 'tools of the trade' were found at his house, no money was ever seized from his house, and he had other legitimate employment." The government, however, does not take issue with these particular factual points. Terry also recognizes that the government does not take issue with his factual contention that it is not clear that he was aware of the full extent of the drug trafficking that Washington undertook at his residence because on some of those occasions Terry was not present. In sum, there is no real dispute as to the facts relied upon by the government and the district court in applying the enhancement.

Terry nonetheless seeks to undermine the district court's factual conclusions by contending that the government never attempted to search Terry's house and that a cooperating defendant testified that she would deliver only 5–10 grams of narcotics to Terry at a time. But even if these points have some inferential weight, they are simply not enough to rule that the district court's factual findings were clearly erroneous.

Turning to the law that applies to those facts, the district court did not err in determining the scope of the guideline enhancement to encompass Terry's maintenance of his premises.

First of all, it makes sense to interpret "for the purpose of manufacturing *or distributing* a controlled substance," U.S.S.G. § 2D1.1(b)(12) (emphasis added), in the words of the enhancement, as set forth in the Guidelines' commentary:

> Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises. In making this determination, the court should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes.

U.S.S.G. § 2D1.1 cmt. n.17. This makes clear that the purpose of maintaining the house need not be the premises' sole purpose but may be "one of" the primary uses, as explicitly opposed to "incidental or collateral uses for the premises." *Id.* It may be incidental or collateral, for instance, for a drug dealer to occasionally buy or sell small amounts of his preferred drug at home, all the while conducting his profit-making activity elsewhere, in contrast with the regular use of his home for the business of drug sales. Turning a neighborhood into a recognizable drug business area by repeated sales and transactions corrupts a neighborhood in a way that warrants a steeper penalty. In that light, it is perfectly reasonable to interpret the words of the guideline to encompass places like Terry's residence that can be readily recognized as the place of drug business by a recognizable pattern of transactions. Indeed, we have reasoned that the more the home looks like a business and "play[s] a significant part" in drug-trafficking operations, the more it meets the requirements of the enhancement. *United States v. Johnson*, 737 F.3d 444, 447–49 (6th Cir. 2013); *United States v. Hagan*, 766 F. App'x 356, 359 (6th Cir. 2019).

Moreover, a limited number of repeated drug sales may reasonably be viewed as the tip of the iceberg. In *United States v. Broadnax*, 777 F. App'x 137 (6th Cir. 2019), for instance, we upheld application of the enhancement from three instances of directing drug customers to the defendant's home over an approximately two-week period. *Id.* at 142. In addition, it can reasonably be inferred that the total number of customers at the location would exceed the number of controlled purchasers.

To be sure, it might be possible linguistically to interpret the guideline to require some greater number of incidences or types of drug activity than found in the facts of this case, but the courts generally have not done so, and our court certainly has not done so.

Terry cites our unpublished opinion in *Whiteside*, which overturned an application of the drug premises guideline, but that case is different. *United States v. Whiteside*, 747 F. App'x 387 (6th Cir. 2018). Two homes were involved in that case, but the issue in one was not the purpose of maintaining the house but whether the defendant had exercised the necessary control of the premises. *Id.* at 394. With respect to the second home, we held, upon confession of error by the government, that two drug transactions—one in the house and one on the nearby street—were not sufficient to apply the enhancement. *Id.* at 395. Our entire analysis was brief:

> The government's case regarding the . . . residence suffers from a different problem—failure to show more than the act of distribution from the premises. Proof of one drug transaction inside the home and another drug transaction on the street nearby, without more, does not sufficiently establish that drug activity was a primary use of the premises. *See Johnson*, 737 F.3d at 448 (drug distribution must constitute a "significant or important reason for which [the defendant] maintained his home rather than a mere incidental or collateral use" (citation and internal quotation marks omitted)).
>
> Because the record does not support the drug-premises enhancement for either residence, we VACATE Whiteside's sentence and REMAND to the district court only for resentencing.

*Id.* (second alteration in original). The government in *Whiteside* pointed to no other evidence that Whiteside used the premises for drug trafficking. *See id.* at 389–95. The two transactions in that case could be considered almost a paradigm of the "incidental or collateral" use of property contrasted in the Guidelines' commentary, U.S.S.G. § 2D1.1 cmt. n.17, and can easily be distinguished from the amount of activity in this case supporting the maintenance of the premises for the purpose of distributing drugs. In *United States v. Davis*, 815 F. App'x 908 (6th Cir. 2020), we likewise distinguished *Whiteside* based on the number of transactions. *Id.* at 917.

Terry argues that this case involves smaller amounts of drugs or fewer occasions of drug activity than in some of our cases upholding the application of the enhancement, and this doubtless is in several cases true. *See, e.g.*, *United States v. Gardner*, 32 F.4th 504, 526 (6th Cir. 2022); *United States v. Bell*, 766 F.3d 634, 635–36 (6th Cir. 2014); *Johnson*, 737 F.3d at 445;

*Hagan*, 766 F. App'x at 357–58; *United States v. Murillo-Almarez*, 602 F. App'x 307, 312 (6th Cir. 2015); *see also Davis*, 815 F. App'x at 916–18; *United States v. Tippins*, 630 F. App'x 501, 504 (6th Cir. 2015).  But it is simply a logical fallacy to infer from a holding that "X is enough" for the enhancement that "less than X is not enough."  In *Johnson*, we rejected a similar argument, explaining that a holding that certain facts were *sufficient* to apply an enhancement in prior cases "does not mean that those facts *necessarily* must be shown in every case."  737 F.3d at 448.

Apart from *Whiteside*, Terry points to no Sixth Circuit case holding that the enhancement did not apply, and we have not found one.  In contrast, moreover, our court has instead stated that the evidentiary bar for applying the enhancement is a "relatively low" one, *United States v. Leggett*, 800 F. App'x 378, 381 (6th Cir. 2020), and has explained that "[d]rug storage on the property and transactions on the property will usually suffice," *Bell*, 766 F.3d at 638.  We have upheld application of the enhancement where an apartment received eleven cocaine packages, *United States v. Rentas*, No. 22-3274, 2023 WL 4080101, at *1, *4 (6th Cir. June 20, 2023); where there were two or three nights of drug activity in a hotel room, *United States v. Hill*, No. 22-5274, 2023 WL 152474, at *1, *3 (6th Cir. Jan. 11, 2023); where there were at least nine or ten buys at the house and the defendant possessed at least 27.65 grams of meth there, *United States v. Davis*, No. 20-6116, 2021 WL 4988337, at *1, *5 (6th Cir. Oct. 27, 2021); and where the defendant stored drugs at his apartment for one week, *United States v. McFarland*, Nos. 20-5310/5587, 2021 WL 7367157, at *8 (6th Cir. Oct. 4, 2021) (per curiam) (order).  Like Terry's circumstances, most of these cases involved only the distribution of a controlled substance as opposed to drug trafficking plus manufacturing.  While these examples can, to be sure, be distinguished on one ground or another, they do show that the words of the guideline encompass small-scale as well as large-scale drug-distribution activities.

Other circuits have applied the enhancement in roughly comparable cases.  For instance, the Fifth Circuit has held that "the long-term, residential quality of the premises cannot shield" the defendant from the enhancement where "the premises were eventually used on a continuing basis for the storage and distribution of drugs."  *See United States v. Galicia*, 983 F.3d 842, 844 (5th Cir. 2020).  The Eighth Circuit upheld applying the enhancement where the defendant used

her home "for the purpose of actively participating in at least three controlled buys on the property, and [accepted] payments that she knew were for methamphetamine purchases on other occasions," and her "teenage son helped deliver the methamphetamine to" one purchaser. *United States v. Miller*, 698 F.3d 699, 705–06 (8th Cir. 2012). The Fourth Circuit upheld application of the enhancement where the defendant had engaged in three confirmed heroin deals and during one of them offered to arrange future purchases. *United States v. Saxby*, 754 F. App'x 161, 164–65 (4th Cir. 2018) (per curiam). In addition, the Tenth Circuit held that evidence showed the defendant had sold meth at or near his residence on three separate occasions and that he had arranged for the later delivery of an additional shipment of meth, and the court held that such evidence supported application of the enhancement. *United States v. Henderson*, 604 F. App'x 655, 658–59 (10th Cir. 2015) (order).

Terry also argues that the court may only count the drug deals that he made from the house, excluding those involving Washington. But a court may properly consider the conduct of a co-conspirator when applying this enhancement. *See Rich*, 14 F.4th at 495–97. If the enhancement may apply where a co-conspirator is the one maintaining the premises, it follows inexorably that use of the defendant's personal premises by a co-conspirator can count toward the activity that shows the purpose for maintaining the premises.

Lastly, Terry claims he primarily used the premises as a residence. However, distributing drugs "need not be the sole purpose" for the premises. U.S.S.G. § 2D1.1 cmt. n.17. It must only be "one of [Terry's] primary or principal uses for the premises." *Id.* We have repeatedly held that the enhancement may apply where the defendant maintained the premises for his or her own residence as well as for the purpose of drug manufacture or distribution. *See Gardner*, 32 F.4th at 526; *Bell*, 766 F.3d at 638; *Davis*, 815 F. App'x at 917; *Broadnax*, 777 F. App'x at 141–42.

The judgment of the district court is affirmed.

---

**DISSENT**

---

KAREN NELSON MOORE, Circuit Judge, dissenting.　In determining Michael Dominique Terry, Jr.'s guidelines sentencing range, the district court applied the drug-premises enhancement based on evidence that six or seven drug transactions took place at Terry's house over the span of almost one year.　By himself Terry conducted only two sales at the residence, involving minor quantities of fentanyl.　And no evidence suggests that Terry manufactured drugs in his residence, stored large quantities of drugs in the residence, or kept weapons, business records, or other tools of the trade related to a drug distribution business there.　The majority holds that such slight evidence is sufficient to uphold the application of the drug-premises enhancement to Terry's guidelines sentencing range.　Because both this court and our sibling circuits have required more evidence to support the application of the drug-premises enhancement, I disagree.　I believe that the district court erred in applying the drug-premises enhancement in calculating Terry's guidelines sentencing range.　I would therefore vacate Terry's sentence and remand his case to the district court for resentencing.　I respectfully dissent.

This court has previously expressed that "[o]ur circuit has not settled on the proper standard of review for assessing such enhancements." *United States v. Bell*, 766 F.3d 634, 636 (6th Cir. 2014).　Although questions of procedural reasonableness are generally reviewed for abuse of discretion, *Gall v. United States*, 552 U.S. 38, 51 (2007), a "district court's factual determinations concerning the application of an . . . enhancement are reviewed for clear error" and its legal conclusions concerning "the application of that enhancement[] are reviewed de novo," *United States v. Sweet*, 630 F.3d 477, 480 (6th Cir. 2011).　I would not settle the complicated question of which standard applies here, because regardless of the standard of review, I reach the same conclusion.

The drug-premises enhancement increases a defendant's offense level by two levels "[i]f the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance."　U.S.S.G. § 2D1.1(b)(12).　This "enhancement applies to anyone who

(1) knowingly (2) opens or maintains any place (3) for the purpose of manufacturing or distributing a controlled substance." *United States v. Johnson*, 737 F.3d 444, 447 (6th Cir. 2013). The Sentencing Guidelines commentary explains that:

> Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises. In making this determination, the court should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes.

U.S.S.G. § 2D1.1 cmt. n.17. "[T]he primary or principal use of the home, or some part of it," is determined "by comparing the frequency of lawful to unlawful use." *Bell*, 766 F.3d at 637.

This court has previously upheld the application of the drug-premises enhancement when there was evidence demonstrating that the defendant manufactured drugs in the residence, stored large quantities of drugs in the residence, or the residence played a central role in a larger-scale drug-trafficking operation. *See Johnson*, 737 F.3d at 447, 449 (affirming application of the enhancement where the defendant "stored 1200 pounds of [marijuana] in his home during an eight-month period" and evidence showed the residence was "the key supply and distribution center where bulk shipments of drugs purchased from a wholesaler were converted to smaller shipments prepared for sale"); *Bell*, 766 F.3d at 637 (affirming application of the enhancement where the defendant "used the house to cook and package" cocaine for distribution); *United States v. Gardner*, 32 F.4th 504, 526 (6th Cir. 2022) (affirming application of the enhancement where "evidence showed that [the defendant] used his home to receive, weigh, distribute, and cook cocaine"); *United States v. Murillo-Almarez*, 602 F. App'x 307, 312 (6th Cir. 2015) (affirming application of the enhancement where "[a] great deal of cash and heroin was recovered from the apartment" and the defendant "brought large quantities of heroin to the apartment to be distributed by his coconspirators"); *United States v. Davis*, 815 F. App'x 908, 916 (6th Cir. 2020) (affirming application of the enhancement where the defendant "deal[t] drugs daily from his home" at an estimated profit of "$8,000 a day"); *United States v. Broadnax*, 777 F. App'x 137, 142 (6th Cir. 2019) (affirming application of the enhancement where the defendant stored "pounds of marijuana" in the home); *United States v. Tippins*, 630 F. App'x

501, 504 (6th Cir. 2015) (affirming application of the enhancement where the defendant "cooked cocaine in the home" and a search found "[d]rugs, many of them prepackaged for distribution, . . . stashed throughout the home" (quotations omitted)). There is no evidence in the record to suggest that Terry engaged in any such activities.

Instead, the facts supporting the application of the drug-premises enhancement to Terry's guidelines sentencing range are relatively slight. The district court found the following facts to support the enhancement:

> First, a confidential informant conducted multiple controlled buys from the defendant at that residence. Second, Washington conducted multiple distribution and narcotics at that residence. The continuation of the criminal complaint includes two instances where, based on officer training and experience, Washington conducted deals at the defendant's residence or outside of the residence with defendant present at the residence.

R. 405 (Sent'g Hr'g Tr. at 12) (Page ID #2034). At most, the record shows approximately six or seven drug transactions at Terry's house over the course of almost a year. R. 383 (PSR ¶ 37) (Page ID #1792–94); R. 405 (Sent'g Hr'g Tr. at 10) (Page ID #2032).[1] The two sales that Terry conducted by himself involved relatively minor amounts of fentanyl—0.19 grams on December 9, 2020 and 0.46 grams on January 21, 2021. R. 383 (PSR ¶ 37) (Page ID #1792–94). There were two small sales involving Terry and Washington in February 2021 at the residence. *Id*. There is no evidence that large quantities of drugs were stored at Terry's residence, nor is there evidence that drugs were manufactured on the premises. And the parties agreed at Terry's sentencing hearing that Washington did not trust Terry with more than minor amounts of drugs "because he was bad with money." R. 405 (Sent'g Hr'g Tr. at 4, 7, 10) (Page ID #2026, 2029, 2032).

These facts are insufficient to support the application of the drug-premises enhancement. There is nothing to suggest that Terry manufactured drugs at his residence or stored drugs for the purpose of distribution. Nor were any drugs, drug paraphernalia, guns, cash, or other evidence of a drug distribution business found at Terry's residence. This court has previously declined to

---

[1]It is unclear from the record whether any additional drug-related activity occurred at Terry's residence. In analyzing the applicability of the enhancement, I therefore rely on the facts presented to the district court at Terry's sentencing hearing and in the sentencing documents, such as the PSR.

uphold the application of the drug-premises enhancement where the government "fail[ed] to show more than the act of distribution from the premises." *United States v. Whiteside*, 747 F. App'x 387, 395 (6th Cir. 2018).

The government has also failed to make the requisite showing in Terry's case. The government alleges that, over the course of nearly a year, there were only four controlled buys of drugs by confidential informants from Terry at Terry's residence, all involving relatively minor amounts of drugs. Appellee Br. at 3; R. 383 (PSR ¶ 37) (Page ID #1792–94). And the government relies on "three drug deals inside or just outside Terry's residence" by Washington. Appellee Br. at 4–6. The drug activity at Terry's residence was therefore both relatively infrequent and insignificant. And there is no evidence that drugs were stored or manufactured there, nor that business records or "tools of the trade" were kept there. Therefore, I conclude that the district court erred in applying the drug-premises enhancement when calculating Terry's guidelines sentencing range.

My analysis of this issue also comports with the holdings of this court's sibling circuits. The Tenth Circuit, for example, has explained that its "case law, and that of other circuits, instructs that for drug-related activity to constitute a primary use of the residence, it must not only be frequent but also substantial." *United States v. Murphy*, 901 F.3d 1185, 1191 (10th Cir. 2018) (collecting cases). The Seventh Circuit has highlighted that, when comparing the frequency of lawful to unlawful use in the context of a defendant's residence, "the sentencing court should focus on both the frequency and significance of the illicit activities, including factors such as quantities dealt, customer interactions, keeping 'tools of the trade' and business records, and accepting payment." *United States v. Contreras*, 874 F.3d 280, 284 (7th Cir. 2017) (quoting *United States v. Flores-Olague*, 717 F.3d 526, 533 (7th Cir. 2013)). In sum, other circuits require more evidence to support the application of the drug-premises enhancement. *See Murphy*, 901 F.3d at 1191; *Contreras*, 874 F.3d at 284; *Flores-Olague*, 717 F.3d at 533 (upholding the application of the enhancement where the defendant "sold and stored drugs at his home . . . 'on a daily basis' over a three-year period"); *United States v. Jones*, 778 F.3d 375, 385 (1st Cir. 2015) (holding that purpose is "inferred from the totality of the circumstances, including such facts as the quantity of drugs discovered and the presence of drug paraphernalia or tools of

the drug-trafficking trade" and upholding the application of the enhancement where a "search of the apartment disclosed . . . sizeable quantities of cocaine and numerous accoutrements of the drug-trafficking trade"); *United States v. Messer*, 655 F. App'x 956, 958 (4th Cir. 2016) (upholding application of the enhancement where the defendant "stored drugs, proceeds from drug trafficking, and firearms derived from drug trafficking in the barn, and at least sometimes conducted his drug transactions in the barn"); *United States v. Rodriguez*, 707 F. App'x 224, 227 (5th Cir. 2017) (expressing skepticism that evidence "that drugs intended for distribution were present in the [defendant's] home once" along with evidence of "large quantities of cash and a firearm in his home" were sufficient to apply the enhancement); *United States v. Galicia*, 983 F.3d 842, 844 (5th Cir. 2020) (holding that "the long-term, residential quality of the premises cannot shield [the defendant] from this enhancement" because "the premises were eventually used on a continuing basis for the storage and distribution of drugs"). This court also ought to require more evidence to support the application of this enhancement.

Because I believe that there is insufficient evidence to demonstrate that manufacturing or distributing controlled substances was a primary or principal purpose for which Terry maintained the premises, I would hold that the drug-premises enhancement was incorrectly applied in calculating Terry's guidelines sentencing range. Accordingly, I would vacate Terry's sentence and remand his case to the district court for resentencing. I therefore respectfully dissent.