NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0113n.06

No. 23-1225

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Mar 11, 2024
KELLY L. STEPHENS, Clerk

|                                 |     |                                      |
| ------------------------------- | --- | ------------------------------------ |
| UNITED STATES OF AMERICA,       | )   |                                      |
|                                 | )   |                                      |
|   Plaintiff-Appellee, | )   | ON APPEAL FROM THE UNITED            |
|                                 | )   | STATES DISTRICT COURT FOR            |
| v.                              | )   | THE WESTERN DISTRICT OF              |
|                                 | )   | MICHIGAN                             |
| DEMETRUS DARIEL HEARD,          | )   |                                      |
|                                 | )   |                                      |
|   Defendant-Appellant.| )   | OPINION                              |
|                                 | )   |                                      |

Before: SUTTON, Chief Judge; SUHRHEINRICH and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. The police intercepted phone conversations suggesting that Demetrus Heard operated a "stash house" for his brother. They then uncovered methamphetamine and firearms at Heard's apartment. A jury found that he took part in a drug conspiracy. On appeal, Heard argues that the government lacked sufficient evidence to convict him. He also raises several sentencing challenges. According to Heard, the district court mistakenly calculated his guidelines range for three reasons: it held him responsible for the drugs at his apartment, found that he maintained a drug premises, and concluded that he possessed the firearms in connection with the conspiracy. Heard lastly argues that the court should have disavowed the guideline that increased his sentence due to the high purity of the recovered drugs. Rejecting all five claims, we affirm.

I

This case reaches us after a jury trial. We thus recite the facts in the light most favorable to the guilty verdict. *See United States v. Maya*, 966 F.3d 493, 496 (6th Cir. 2020).

In July 2021, officers obtained a wiretap to listen in on the drug-trafficking operations of John Humphrey in Lansing, Michigan. Humphrey's calls identified several other participants in his drug trafficking, including Arnon Lake, Davanti Heard-White, and Heard (the appellant). Through these calls, investigators learned that Lake helped Humphrey distribute drugs. They learned that Heard-White was a "source of supply" for Humphrey. Parrott Tr., R.462, PageID 3476−77. And they learned that Heard-White liked to keep drugs at a "stash house" believed to be the apartment of his brother: Heard. *Id.*, PageID 3478–79. Heard went by the nickname "Meech," and Heard-White often referred to him as "bro." *Id.*, PageID 3478, 3480, 3517–18.

One of the first intercepted calls on July 1 revealed many of these facts. During this call, Heard-White told Humphrey that Humphrey could "pull up over there at bro's" and "get 'em anytime[.]" Govt. Ex. 11, R.473-1, PageID 4069. Yet Humphrey complained that he did not like going to this location. Heard-White responded: "Yeah, but . . . that's the only place I'm comfortable, I can leave them, I can, you feel me, I don't got so many places I can leave them at[.]" *Id.* The police interpreted this conversation as showing that Heard-White had a Lansing "stash house" managed by "bro" ("someone that he was very comfortable with") but that Humphrey did not like to obtain drugs from this person. Parrott Tr., R.462, PageID 3479.

Two days later, phone conversations showed Heard-White and Humphrey agree to a drug deal for four pounds of methamphetamine. In an initial call, Humphrey asked if Heard-White felt like "bringing a few of them." Govt. Ex. 12, R.473-2, PageID 4072. When Heard-White inquired into the desired quantity, Humphrey responded "just bring in four." *Id.* Humphrey added that he

only had "10 racks" ($10,000) to pay Heard-White and that he would have to "owe" him for the rest. *Id.* This total approximated the existing price of methamphetamine in Lansing ($3,000 to $5,000 per pound). Heard-White concluded the call by noting that he had to "go grab 'em" (the drugs). *Id.* In a later phone call, Humphrey and Heard-White arranged for this drug transfer. At the outset, Humphrey overheard someone in the background and asked who Heard-White was with. Govt. Ex. 13, R.473-3, PageID 4075. Heard-White said "Meech." *Id.* Humphrey switched to asking whether Heard-White was "ready to link up." *Id.* The two men then decided where they would meet.

Calls from July 20 recorded another methamphetamine deal. Humphrey asked Heard-White if Lake could pick up drugs and promised to pay for them later. Heard-White agreed. So Humphrey let Lake know that he should obtain "five pounds" from Heard's apartment. Govt. Ex. 24, R.473-5, PageID 4081. In a follow-up call between Heard-White and Humphrey, Heard-White noted that Lake should "pull up" to Heard's apartment and that Heard-White would "have bro give it to him." Govt. Ex. 25, R.473-6, PageID 4084. Humphrey thus relayed to Lake that "Meech is going to uh, just hand you the bag." Govt. Ex. 26, R.473-7, PageID 4086. The police then spotted Lake's car entering Heard's apartment complex. After the exchange, Lake told Humphrey that he received only "four" pounds. Govt. Ex. 473-9, PageID 4090. Still, Humphrey excitedly yelled "Touchdown!" once Lake made it safely home. *Id.*, PageID 4091.

The wiretap authorization expired at the end of July. By then, the officers had enough information to execute a "large scale takedown" of all the traffickers. Parrott Tr., R.462, PageID 3505. They obtained 14 search warrants, including a warrant to search Heard's apartment. Some 100 officers executed these warrants on August 3. When the police entered Heard's apartment, an officer stationed outside spotted him open a window in an attempt to flee. The officers inside the

apartment then shouted for everyone to come out. Heard and a woman emerged from a bedroom and surrendered.

Officers discovered evidence of drug trafficking at Heard's apartment. A police dog alerted to the presence of narcotics at three locations. The police found about 13 pounds of pure methamphetamine inside luggage in a bedroom converted into a storage room. They separately found a few grams of fentanyl in the kitchen. Apart from the drugs, officers located a handgun in Heard's bedroom, another handgun in a bathroom, and ammunition at both places. They also found $3,464 in cash, several cellphones, and a digital scale. One of Heard's phones contained pictures of himself and his brother with large stacks of cash.

The government charged Heard, Heard-White, Humphrey, Lake, and three others with conspiring to distribute (or possess with the intent to distribute) at least 50 grams of methamphetamine from September 2020 to August 2021. *See* 21 U.S.C. § 846. It also charged Heard with possessing with the intent to distribute at least 50 grams of methamphetamine on the day of the police search. *See id.* § 841(a)(1). Most defendants pled guilty. Heard stood trial. The jury convicted him of the conspiracy charge but acquitted him of the possession charge.

The district court calculated Heard's guidelines range as 168 to 210 months' imprisonment. It varied downward by imposing a 121-month sentence, one month above the statutory minimum.

II

Heard raises a sufficiency-of-the-evidence challenge to his conviction and several guidelines-related challenges to his sentence. None has merit.

A. Sufficiency Challenge

Heard first argues that the government failed to introduce enough evidence to convict him of a drug-trafficking conspiracy. His argument faces an uphill battle given our "'demanding' test"

for proving this type of claim. *United States v. Hinojosa*, 67 F.4th 334, 340 (6th Cir. 2023) (quoting *United States v. Potter*, 927 F.3d 446, 453 (6th Cir. 2019)). Heard's argument must fail so long as a "rational" jury "could have found the essential elements" of the charged conspiracy "beyond a reasonable doubt." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). And when asking whether a rational jury could have convicted Heard, we must accept all "reasonable" factual "inferences" that might have supported the actual jury's guilty verdict. *Maya*, 966 F.3d at 499 (quoting *Musacchio v. United States*, 577 U.S. 237, 243 (2016)).

To prove a drug conspiracy that violates 21 U.S.C. § 846, the government must establish that two or more people entered into an agreement to distribute drugs and that Heard knowingly joined the agreement. *See Potter*, 927 F.3d at 453. Heard concedes that the evidence showed that Humphrey and Heard-White agreed to distribute drugs to other parties. This case thus turns on whether the evidence sufficed to prove that Heard knowingly joined their agreement. To establish this element, the government did not need to prove that Heard entered into a written or oral contract with Heard-White. *United States v. Wheat*, 988 F.3d 299, 306 (6th Cir. 2021). Rather, Heard could face conspiracy liability if he and his brother had an "unspoken 'meeting of the minds'" that he would assist in the distribution efforts. *Id.* at 306−07 (citation omitted).

Did the government meet this test here? Yes, the evidence allowed a "rational jury" to infer that Heard knowingly permitted his brother to store drugs at his apartment and helped in the trafficking of the drugs. *Maya*, 966 F.3d at 502. Start with the wiretap evidence. The very first call on July 1 suggested that Heard's apartment served as Heard-White's stash house. When talking to Humphrey, Heard-White noted that he felt "comfortable" storing his drugs at only one place. Govt. Ex. 11, R.473-1, PageID 4069. Where? Heard-White said that Humphrey could "pull up over there at *bro's*" to obtain drugs "anytime[.]" *Id.* (emphasis added). Another call on

5

July 3 corroborated Heard's knowledge of his brother's drug dealing. Heard-White told Humphrey that "Meech" (that is, Heard) was with him as the two discussed where to exchange methamphetamine. Govt. Ex. 13, R.473-3, PageID 4075. Calls two weeks later confirmed Heard's involvement. They showed Heard (acting for Heard-White) distributing pounds of methamphetamine to Lake (acting for Humphrey). In one call, Heard-White told Humphrey that "*bro*" would "give" the drugs to Lake. Govt. Ex. 25, R.473-6, PageID 4084 (emphasis added). In another, Humphrey told Lake that "Meech" would "hand [him] the bag" of drugs. Govt. Ex. 26, R.473-7, PageID 4086. And police surveillance verified that Lake traveled to Heard's apartment complex for this exchange.

Turn to the physical evidence. The police found 13 pounds of methamphetamine at Heard's apartment, proving Heard-White's statement that Heard had been "[p]roviding a storage space" for his drugs. *United States v. Guadarrama*, 591 F. App'x 347, 354 (6th Cir. 2014); *see United States v. Alexander*, 530 F. App'x 565, 567–68 (6th Cir. 2013). The police also found additional drugs and a digital scale in the kitchen and firearms in other places—all of which bolstered the conclusion that Heard was operating a stash house. *See United States v. Burris*, 999 F.3d 973, 979 (6th Cir. 2021). So did the "large amount of cash" in the apartment. *United States v. Taylor*, 471 F. App'x 499, 516 (6th Cir. 2012); *cf. Maya*, 966 F.3d at 502.

Lastly, the jury could further infer Heard's knowledge of the drugs in his apartment from his attempt to flee at the start of the search on August 3. *See United States v. Cantrell*, 807 F. App'x 428, 433 (6th Cir. 2020); *United States v. Wales*, 68 F. App'x 575, 584 (6th Cir. 2003); *see also United States v. Suggs*, 822 F. App'x 422, 431–32 (6th Cir. 2020).

6

In response, Heard offers an "alternative explanation" for how 13 pounds of drugs might have ended up in his apartment: Heard-White secretly put them there. *United States v. Rosales*, 990 F.3d 989, 996 (6th Cir. 2021). To support this theory, Heard notes that only Heard-White spoke to Humphrey about drug deals. He adds that Heard-White might have been discussing someone else when he implicated "bro" in his drug dealing. After all, many people use that term colloquially to refer to an acquaintance (not a sibling). But Heard-White always used the word "bro" in the recorded calls to refer to a specific person. Besides, the government's proof can support a guilty verdict even if it does not eliminate "every possibility other than guilt." *United States v. Sharp*, 2023 WL 3966739, at *9 (6th Cir. June 13, 2023). Heard must instead show that *no* "rational trier of fact" could reject his explanation. *Jackson*, 443 U.S. at 319. His factual arguments—which are more suited for a jury than a court of appeals—fall well short of that mark.

Heard also compares this case to *United States v. Sliwo*, 620 F.3d 630 (6th Cir. 2010). There, the government failed to prove that the defendant knew of the "ultimate purpose" or "essential object" of the charged drug conspiracy—a fact necessary to prove that he knowingly joined the conspiracy. *Id.* at 633–34 (citation omitted). The jury in *Sliwo* could have found (among other things) that the defendant acted as a lookout while others loaded marijuana into a van. *Id.* at 634. Critically, though, no evidence showed (and so no rational jury could find) that the defendant knew these accomplices were stocking the van with *marijuana* as opposed to other *contraband*. *Id.* at 634–35. Here, by contrast, a rational jury could have found that Heard knew of the conspiracy's ultimate purpose. Why? The evidence we have discussed allowed the jury to find that Heard knew his brother was storing drugs—rather than, say, "stolen electronic equipment"— in his apartment. *Id.* at 636; *see Rosales*, 990 F.3d at 995–96; *Alexander*, 530 F. App'x at 569.

B.  Sentencing Challenges

Heard alternatively raises four challenges to his sentence.  We consider each in turn.

*Challenge One: Should Heard be held accountable for the drugs found at his home?*  The drug-offense guideline sets a defendant's base offense level based on the total amount of drugs involved in the crime.  U.S.S.G. § 2D1.1(a)(5), (c).  When calculating this total in Heard's case, the presentence report included the 13 pounds of pure methamphetamine found at his apartment.  Heard did not object to this decision, and the district court relied on it to identify his guidelines range.  Now, however, Heard argues that the court should have disregarded these drugs because the jury acquitted him of the second count charged against him: that he possessed methamphetamine with the intent to distribute it on the date of the police search.  According to Heard, the district court's use of this "acquitted conduct" at sentencing violated the Constitution.

Although the government argues that the jury's split verdict did not absolve Heard of responsibility for this methamphetamine, we need not get into that debate.  We see two other problems with Heard's argument.  For one, we must apply the deferential plain-error test because Heard failed to raise the argument in the district court.  *See United States v. O'Lear*, 90 F.4th 519, 534–35 (6th Cir. 2024).  For another, Heard cannot show plain error because courts have consistently rejected claims that the Constitution bars district courts from relying on acquitted conduct at sentencing.  *See United States v. Watts*, 519 U.S. 148, 157 (1997) (per curiam); *United States v. White*, 551 F.3d 381, 383−86 (6th Cir. 2008) (en banc).

*Challenge Two: Did Heard maintain a "drug premises"?*  The drug-offense guideline also instructs district courts to increase a defendant's offense level "[i]f the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance[.]"  U.S.S.G. § 2D1.1(b)(12).  The guideline's commentary (which both parties accept) clarifies several things

about this enhancement. The commentary clarifies that whether a defendant has "maintained" a house turns on whether the defendant had a "possessory interest" in the house or exercised control over it in other ways. *Id.* § 2D1.1 cmt. n.17; *see United States v. Taylor*, 85 F.4th 386, 389–90 (6th Cir. 2023). It also clarifies that the enhancement covers houses that drug traffickers use for the "storage" of drugs they plan to distribute. U.S.S.G. § 2D1.1 cmt. n.17; *see United States v. Johnson*, 737 F.3d 444, 447–48 (6th Cir. 2013). And it clarifies that a defendant need not use the house for the "sole purpose" of drug distribution. U.S.S.G. § 2D1.1 cmt. n.17. Rather, that distribution need only be one of the house's "primary or principal uses" (in contrast to a mere "incidental or collateral use[]"). *Id.*

Here, the evidence showed that Heard "rented" his apartment, so he does not dispute that he "maintained" it. *Id.* Heard instead argues that he lived at the apartment and thus that any drug activity occurring there could not qualify as a "primary" or "principal" purpose for it. *Id.* The district court rejected this claim. We review its findings of fact (for example, how much drugs did Heard store at the apartment?) for clear error and its legal conclusions (for example, what do the phrases "primary" and "principal" mean?) de novo. *See United States v. Terry*, 83 F.4th 1039, 1040–41 (6th Cir. 2023). But we have yet to settle on the standard of review for the ultimate or mixed question: Did the historical facts that the district court found meet our legal standards for whether a defendant uses a location primarily for drug distribution? *See United States v. Bell*, 766 F.3d 634, 636 (6th Cir. 2014); *cf. United States v. Thomas*, 933 F.3d 605, 608–10 (6th Cir. 2019).

We need not resolve this standard-of-review question here. Even if we review the issue de novo, the evidence showed that one of Heard's "primary or principal uses" of his apartment was to facilitate his brother's drug dealing. U.S.S.G. § 2D1.1 cmt. n.17. His brother said as much. Heard-White suggested that he stored drugs "*only*" at Heard's apartment. Govt. Ex. 11, R.473-1,

9

PageID 4069 (emphasis added). The physical evidence verified this statement. The police found a "great deal" of methamphetamine at the apartment. *United States v. Murillo-Almarez*, 602 F. App'x 307, 312 (6th Cir. 2015). And the apartment contained many other hallmarks of the drug "trade." *See United States v. Leggett*, 800 F. App'x 378, 381 (6th Cir. 2020) (quoting *Johnson*, 737 F.3d at 448). The firearms, the cash, and the digital scale confirmed its status as a stash house.

*Challenge Three: Did Heard possess the firearms during the conspiracy?* The drug-offense guideline next bumps up a defendant's offense level "[i]f a dangerous weapon (including a firearm) was possessed[.]" U.S.S.G. § 2D1.1(b)(1). The commentary (which both parties again accept) presumes that the enhancement will apply if a "weapon was present[.]" *Id.* § 2D1.1 cmt. n.11(A). But it then clarifies that a court should reject the enhancement if it was "clearly improbable" that the weapon (such as an "unloaded hunting rifle in the closet") was connected to the drug offense. *Id.* For decades, we have read this text to adopt a "burden-shifting" approach. *United States v. Kennedy*, 65 F.4th 314, 318 (6th Cir. 2023); *United States v. Hill*, 79 F.3d 1477, 1485–86 (6th Cir. 1996); *United States v. Moreno*, 899 F.2d 465, 470 (6th Cir. 1990). The government must first show that the defendant possessed the firearm during the commission of the offense. *See United States v. McCloud*, 935 F.3d 527, 531 (6th Cir. 2019). If the government meets this burden, the defendant must then attempt the "difficult" task of proving that the possession of the weapon was unrelated to the offense. *United States v. Johnson*, 344 F.3d 562, 567 (6th Cir. 2003).

Here, Heard does not dispute that he possessed the two firearms in his apartment's bedroom and bathroom. Nor does he dispute that this possession occurred during the time of his drug conspiracy. Heard instead argues that he met his burden to prove that it was "clearly improbable" that the weapons had a connection to this conspiracy. U.S.S.G. § 2D1.1 cmt. n.11(A). The district

court again disagreed because the police found the two handguns in the same "house" as the large "quantity" of methamphetamine. Sent. Tr., R.465, PageID 3959. We treat this conclusion as a factual finding subject to deferential clear-error review. *See Johnson*, 344 F.3d at 567. If the conclusion was "plausible," then, we must uphold it. *O'Lear*, 90 F.4th at 536 (citation omitted).

The district court's finding was more than plausible. From a bird's-eye view, it is not "clearly improbable" that a person who operates a stash house storing large amounts of drugs and cash will keep handguns on site to protect the drugs and the drug proceeds. U.S.S.G. § 2D1.1 cmt. n.11(A). From a ground-level view, the specific "factors" that we have previously examined when considering this question support that common-sense conclusion. *See United States v. Moses*, 289 F.3d 847, 850 (6th Cir. 2002). Heard possessed handguns often used in drug trafficking (not sporting rifles) at this apartment. *See id.* at 851. He also had "ready access" to one of the firearms because he kept it next to his bed, not in the closet. *United States v. Clisby*, 636 F. App'x 243, 250 (6th Cir. 2016). This handgun was "loaded" and so ready to fire. *Moses*, 289 F.3d at 850. And he left the firearm in the same room as the money and just one room over from the methamphetamine cache. *Cf. United States v. Keszthelyi*, 308 F.3d 557, 579 (6th Cir. 2002).

According to Heard, the fact that he kept one of the handguns by his bed shows he had it for self-defense. He may be right. But this claim confirms the handgun's connection to the drug conspiracy. Those engaged in dangerous drug trafficking use firearms to protect themselves, their drugs, and their drug proceeds from "rival drug dealers" because they cannot turn to the police to protect their business. *Maya*, 966 F.3d at 502. Defense of oneself and defense of one's business are not mutually exclusive when it comes to the illegal drug trade.

*Challenge Four: Did the district court properly rely on the purity of the drugs?* Lastly, the drug-offense guideline ties a defendant's base offense level to the purity of the methamphetamine the defendant possessed. So, for example, a crime that involves 5 to 15 kilograms of a "mixture or substance" containing methamphetamine starts with a base offense level of only 35, whereas a crime involving just 4.5 kilograms of "actual" methamphetamine (excluding the weight of other substances) starts with a higher base offense level of 38. U.S.S.G. § 2D1.1(c)(1), (3); *see id.* § 2D1.1(c), Notes to Drug Quantity Table (A)–(B). Because the methamphetamine recovered from Heard's apartment did not contain any other substance, the presentence report treated it as "actual" methamphetamine for purposes of his base offense level. Heard did not object to this conclusion, so the district court adopted it. On appeal, though, Heard argues that this guideline irrationally ties a defendant's offense level to the methamphetamine's purity. As an expert witness in this case noted, most methamphetamine on the market today qualifies as "100 percent pure" because of the large influx of a "Mexico-produced" supply. Giudice Tr., R.461, PageID 3362–63. Since most defendants distribute pure methamphetamine, Heard says, a defendant who does so is no more culpable than the average meth distributor. Heard thus concludes that the district court should have refused to use the higher base offense level.

We can make short work of this claim. Because Heard did not raise it in the district court, plain-error review applies. *See O'Lear*, 90 F.4th at 534–35. And he cannot show a plain error. To be sure, some district courts have refused to follow this guideline for the policy reasons that Heard highlights. *See United States v. Johnson*, 812 F. App'x 329, 334 (6th Cir. 2020) (citing cases). Yet even assuming these courts have the discretion to *reject* the guideline, we have repeatedly held that district courts also have the discretion to *follow* it. *See id.*; *see also United States v. Allen*, 93 F.4th 350, 359–60 (6th Cir. 2024); *Kennedy*, 65 F.4th at 326; *United States v.*

*Mosley*, 53 F.4th 947, 965 (6th Cir. 2022); *United States v. Cain*, 2022 WL 16579603, at *8 (6th Cir. Nov. 1, 2022); *United States v. Ennis*, 2022 WL 976930, at *4 (6th Cir. Mar. 31, 2022); *United States v. Alonzo*, 811 F. App'x 301, 306 (6th Cir. 2020) (per curiam).  So the district court did not commit an obvious error by following the guideline here.

　　We affirm.