NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0218n.06

Nos. 23-5116/5273

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
May 16, 2024
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |
| | ) | |
| | ) | |
| MICHAEL A. BYRD (23-5116); JE'VON BYRD (23-5273), | ) | |
| | ) | |
| Defendants-Appellants. | ) | OPINION |
| | ) | |
| | ) | |

Before: BOGGS, McKEAGUE, and LARSEN, Circuit Judges.

BOGGS, Circuit Judge. Defendants-Appellants Michael A. Byrd and his nephew, Je'Von Byrd, are drug traffickers. They appeal, together, challenging (1) the attribution of fentanyl to Michael Byrd, (2) the sentence enhancement of Michael Byrd for possession of a firearm, (3) the sentence enhancement of Michael Byrd for maintaining a premises for the purpose of manufacturing or distributing controlled substances, (4) the sentence enhancement of Michael Byrd for his leadership in the drug-trafficking operation, and (5) the holding that reasonable suspicion supported the stop of a Ford Explorer that Je'Von Byrd was riding in at the time of a drug bust.

## I. BACKGROUND

Michael Byrd was indicted for conspiracy to distribute 100 grams or more of fluorofentanyl, in violation of 21 U.S.C. § 846, possession with intent to distribute 100 grams or

more of fluorofentanyl, in violation of 21 U.S.C. § 841, and possession with intent to distribute 10 grams or more of fluorofentanyl, also in violation of 21 U.S.C. § 841. Byrd pleaded guilty to each count, and there was no plea agreement.

In March 2021, law enforcement responded to a narcotics overdose at a house in Lexington, Kentucky. At the scene, a "remaining occupant of the residence agreed to cooperate with police and became a cooperating individual (CI)." The CI provided the name of "Bird," which investigators "determined to be Michael A. Byrd."

Using this CI, investigators set up a narcotic deal. Michael Byrd's cell phone was called, and he answered, advising the CI that he would call back. Later, Michael Byrd contacted the CI and advised him "to meet him at the Horseman['s] Lane residence." Investigators then began surveillance of 1100 Horseman's Lane, Apartment #42, in Lexington, Kentucky.

In April 2021, while conducting surveillance on Apartment #42, investigators observed that a dark-colored sedan had arrived. A "drug runner" for Michael Byrd named "John John" got out of the sedan and entered the apartment. Investigators saw John John pull a "wad of money from his right pant pocket" before transferring "an unknown white substance from one bag to another bag."

The CI received a phone call from Michael Byrd that he was five minutes away. The CI informed investigators that Michael Byrd was likely driving a blue 2017 Ford Explorer. After some time, a blue 2017 Ford Explorer and a small sedan pulled up to Apartment #42 together. Investigators observed the driver of the Explorer, identified as Wesley Reed, walking towards Apartment #42, and the passenger, identified as Je'Von Byrd, reaching towards his waist. At that point, investigators told Je'Von Byrd to raise his hands.

Investigators opened the door of the Explorer and immediately observed a handgun, which was later determined to be loaded. Investigators then patted down Je'Von Byrd and located a vacuum-sealed bag of what appeared to be fentanyl. A search of the vehicle recovered two more vacuum-sealed bags of what appeared to be fentanyl and multiple ownership documents with the name Michael Byrd.

Je'Von Byrd "took ownership of the drugs found on his person." Michael Byrd was a passenger in the other car that arrived at Apartment #42 at the same time as the Explorer—the small sedan. No narcotics were found on Michael Byrd. Michael Byrd was detained while a search warrant was prepared for Apartment #42.

Je'Von Byrd's person contained 924.4 grams of fluorofentanyl. The two bags in the vehicle contained 3.01 kilograms and 690.10 grams of fluorofentanyl.

Before leaving the scene, the officers knocked on the door at Apartment #42 and Savanna Asberry, Michael Byrd's romantic partner, answered. According to Asberry, she was alone in the apartment even though investigators had watched John John "enter [it] and not exit." Considering the circumstances, police conducted a protective sweep of the apartment. Police observed an "open safe with numerous pill bottles covered in a white powdery substance believed to be fentanyl" and an open back window. "Three additional firearms, suspected narcotics and drug paraphernalia, including, but not limited to, a hydraulic press, baggies, operational digital scales, cutting agents, and a blender" were also found. The suspected narcotics were later identified as 65.138 grams of fentanyl, 0.223 grams of cocaine, and 5.155 grams of fluorofentanyl and fentanyl.

In April 2022, approximately one year later, an officer on routine patrol observed a vehicle, registered to Michael Byrd, illegally blocking a sidewalk. Later, a police officer observed Michael Byrd standing outside the vehicle. When approached, Michael Byrd ran, threw his jacket off his

body, and was observed reaching his hand into his pants, pulling out something, and throwing it over a fence. Michael Byrd was then taken into custody, where a search of the jacket yielded $3,530 and a cell phone. In the area where he threw something was a bag of suspected fentanyl that had "broken or burst" and the suspected fentanyl was spread over the ground. It was later identified as 84.6 grams of fentanyl.

Michael Byrd continued to use Asberry to coordinate his drug-trafficking operation. In May 2022, Asberry went to Louisville to pick up narcotics. While driving back to Lexington, she and Michael Byrd spoke on the phone during a routine traffic stop in which Michael Byrd asked her if she "locked the shit in the thing" to which she advised that she had "everything" in the car. The car contained a Glock pistol, and "13.87 grams of cocaine, 60.605 grams of fentanyl, and 56.062 grams of methamphetamine."

The lease agreement for Apartment #42 was signed by Michael Byrd. Photographs from his cell phone depicted him with large amounts of U.S. currency. They also depicted suspected narcotics and several individuals with firearms. Michael Byrd maintained that he resided elsewhere—365 Woodview Drive in Lexington, Kentucky—although his name was on the lease of Apartment #42.

In June 2022, based on all the above information, a grand jury ultimately indicted Je'Von Byrd, Michael Byrd, and Savanna Asberry. The Byrds pleaded guilty to the drug crimes. The district court sentenced Michael Byrd to 420 months of imprisonment, followed by ten years of supervised release and sentenced Je'Von Byrd to 120 months of imprisonment followed by 10 years of supervised release. These appeals followed.

**II. ANALYSIS**

*A. Fluorofentanyl in Explorer*

A district court's factual calculation of the drug quantity attributable to a defendant is reviewed for clear error. *United States v. Olsen*, 537 F.3d 660, 663 (6th Cir. 2008). A "finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 384, 395 (1948). The Sentencing Guidelines instruct sentencing courts to calculate a defendant's base offense level from the total quantity of drugs attributable to him. *United States v. Thompson*, 588 F. App'x 449, 452 (6th Cir. 2014). A drug quantity need only be established by a preponderance of the evidence, and an estimate will suffice. *United States v. Anderson*, 526 F.3d 319, 326 (6th Cir. 2008). The testimony of a co-conspirator may be sufficient to support the quantity of drugs attributable to another co-conspirator. *United States v. Swanberg*, 370 F.3d 622, 625 (6th Cir. 2004).

Law enforcement seized two bags, containing 3.01 kilograms and 690.10 grams of fluorofentanyl, from the back seat of the Explorer. The 3.01 kilograms seized was in a backpack. The Explorer had a temporary tag registered to Michael Byrd, the Explorer was registered to Michael Byrd, and business cards of Michael Byrd were inside the vehicle. Je'Von Byrd's pants contained a separate 924.4 grams of fluorofentanyl. The presentence report attributed the 3.01 kilograms of fluorofentanyl to only Michael Byrd. Michael Byrd objected, and the district court overruled the objection.

The district court correctly attributed the 3.01 kilograms of fluorofentanyl in a backpack in the back seat to Michael Byrd. As stated by the district court, Michael Byrd "had picked up the drugs with [fluoro]fentanyl that were found in the backpack." When the two vehicles arrived at

1100 Horseman's Lane Apartment #42, it was a coordinated drug sale between Michael Byrd and the CI where he was "obviously overseeing the operations." Considering the evidence presented, the district court concluded that Michael Byrd "in fact was responsible and had picked up all of those drugs."

Je'Von Byrd's testimony supports this. Before arriving at Apartment #42, Michael Byrd "picked [him] up" and stopped at a retirement home where Michael Byrd "went in there with a camo backpack" and came out and handed Je'Von Byrd the 924.4 grams of fluorofentanyl that ended up in Je'Von Byrd's pants. Additionally, all the fluorofentanyl seized was "consistently wrapped," indicating that it was from the "same source." Michael Byrd's name is a constant in this case, including the drugs seized in the backpack—they were obtained by Michael Byrd, found in a vehicle registered to Michael Byrd, brought to a drug deal coordinated by Michael Byrd that was outside a stash-house apartment that was leased to Michael Byrd. Therefore, the district court's factually-supported conclusions were not clearly erroneous.

*B. Possession of a Firearm*

U.S.S.G. § 2D1.1(b)(1) provides that a defendant convicted of a drug offense is subject to a two-level sentence enhancement if "a dangerous weapon (including a firearm) was possessed." For the sentence enhancement to apply, the government must show, by a preponderance of the evidence, that (1) the defendant actually or constructively possessed the weapon, and (2) such possession was during the commission of the offense. U.S.S.G. § 2D1.1(b)(1); *United States v. Greeno*, 679 F.3d 510, 514 (6th Cir. 2012), *abrogated on other grounds by N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022); *United States v. Faison*, 339 F.3d 518, 520 (6th Cir. 2003). The enhancement reflects the danger of violence when drug traffickers possess weapons, and the enhancement should be applied if the weapon was present "unless it is clearly improbable

that the weapon was connected to the offense." U.S.S.G. § 2D1.1(b)(1); *see* § 2D1.1 cmt. 11(A). Once the government meets its burden, a rebuttable presumption arises that the weapon was connected to the offense and the burden shifts to the defendant to show that it is clearly improbable. *United States v. Hill*, 79 F.3d 1477, 1485 (6th Cir. 1996).

The presentence report included a U.S.S.G. § 2D1.1(b)(1) enhancement, which Michael Byrd objected to. Over Michael Byrd's objection, the district court stated that "there's sufficient evidence to connect the firearms that were in [the] residence to Michael Byrd." The district court noted that it was "clear that [Michael Byrd] had control over the premises . . . the drugs, as well as the firearms, and it [was] foreseeable based upon his knowledge." Moreover, "his own statements do indicate that that he possessed the firearms." The district court properly attributed the firearms located inside 1100 Horseman's Lane, Apartment #42, and properly applied the two-level Guidelines sentence enhancement to Michael Byrd.

Inside 1100 Horseman's Lane, Apartment #42, was "an AR-style rifle fully loaded" and "in the closet, a .40 caliber pistol, as well as a 12-gauge shotgun." The firearms were found in a bedroom that also contained "numerous types and quantities of narcotics," a safe "coated in" residue, and baggies. Michael Byrd told law enforcement that "everything inside belonged to him," indicating that he possessed the firearms.

Other evidence links Michael Byrd to the firearms: his statement to Savanna Asberry, "in which he was not startled when she indicated she had a gun" on her supports his knowledge of firearms; he was photographed with firearms, including one photograph of him holding "what appears to be a pistol in [his] right front pants pocket" and another in which Michael Byrd is holding cash with "several firearms" in the frame, including the AR-style firearm seized from 1100

Horseman's Lane, Apartment #42. Although the district court acknowledged that the photographs are "not conclusive," they do indicate a connection.

This court reviews the district court's factual determinations related to this enhancement for clear error. *United States v. West*, 962 F.3d 183, 187 (6th Cir. 2020). In this case, the firearms were found within the Explorer and the stash house—both registered to and leased by Michael Byrd. He was a self-proclaimed drug trafficker, who admitted that everything inside the apartment belonged to him. The district court did not err in imposing this enhancement on Michael Byrd.

Also, it is not clearly improbable that the weapon was connected to the offense. Regardless of whether the firearm was on him or whether he was photographed with the firearm, the district court was correct in ruling that, considering the circumstances, there was no question "he's responsible." Even if there are "two permissible views of the evidence," a district court's "choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985).

*C. Maintaining Premises*

Guidelines section 2D1.1(b)(12) provides for a two-level enhancement "[i]f the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." Any defendant convicted of a federal drug crime who maintained a premises for the purposes of manufacturing or distributing a controlled substance is subject to the enhancement, and the enhancement applies to anyone who "(1) knowingly (2) opens or maintains any place (3) for the purpose of manufacturing or distributing a controlled substance." U.S.S.G. § 2D1.1(b)(12); *United States v. Johnson*, 737 F.3d 444, 447 (6th Cir. 2013). The drug trade "need not be the sole purpose" for maintaining the place; it need only amount to a "primary or principal use[]" as opposed to an "incidental or collateral use[]." U.S.S.G. § 2D1.1(b)(12) cmt. 17.

The presentence report applied the § 2D1.1(b)(12) enhancement, Michael Byrd objected, and the district court overruled and applied the enhancement. Although we "ha[ve] not settled on the proper standard of review for assessing such enhancements," the district court's application was proper in this case. *United States v. Bell*, 766 F.3d 634, 636 (6th Cir. 2014); *see also United States v. Terry*, 83 F.4th 1030, 1041 (6th Cir. 2023).

Michael Byrd maintained 1100 Horseman's Lane, Apartment #42, for the purpose of manufacturing or distributing controlled substances, more commonly known as a stash house. There was a bed, a closet, articles of clothing, and other items in the apartment; there were also needles, a blow-up mattress, marijuana, a hydraulic press, scales, baggies, cutting agents, a blender with white residue, and evidence of a surveillance system.

Michael Byrd also maintained a separate primary residence, and leased 1100 Horseman's Lane, Apartment #42, a few months before this incident. The apartment was sparsely furnished, had clothing in bags, with little hanging in the closet, and little, if any, food. A bedroom upstairs contained a firearm, two more firearms in the closet, "numerous types and quantities of narcotics," a safe "coated in" residue, and baggies. Michael Byrd clearly maintained this apartment for the purpose of manufacturing or distributing controlled substances. The evidence supports the enhancement, and the district court's application of the enhancement was proper in Michael Byrd's case.

*D. Leadership Enhancement*

An offense level is increased by two if the defendant is found to be an "organizer, leader, manager, or supervisor in any criminal activity" that involved fewer than five participants and was not otherwise extensive. U.S.S.G. § 3B1.1(c). In determining whether a defendant is an organizer, leader, manager, or supervisor in any criminal activity, the court should consider

the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1 cmt 4.

Generally, a "defendant must have exerted control over at least one individual within a criminal organization for the enhancement of § 3B1.1 to be warranted." *United States v. Gort-DiDonato*, 109 F.3d 318, 321 (6th Cir. 1997). "Merely playing an essential role in the offense is not equivalent to exercising managerial control over other participants." *United States v. Minter*, 80 F.4th 753, 758 (6th Cir. 2023) (quoting *United States v. Vandenberg*, 201 F.3d 805, 811 (6th Cir. 2000)). The government bears the burden of proving that the enhancement applies by a preponderance of the evidence. *United States v. Martinez*, 181 F.3d 794, 797 (6th Cir. 1999). We review the decision to impose a leadership enhancement under § 3B1.1 deferentially because it raises a fact-intensive question. *United States v. Washington*, 715 F.3d 975, 983 (6th Cir. 2013).

The presentence report applied the § 3B1.1(c) enhancement, Michael Byrd objected, and the district court overruled, finding that there is "more than sufficient evidence to establish clearly" that the enhancement applies. We agree.

Michael Byrd was the organizer, leader, manager, or supervisor of this criminal activity. First, "it [is] apparent" from looking at the photographs of him "holding large sums of currency" that he was "making a significant profit from his actions." Sentencing Tr., R.184 at PageID 846-47 (finding "evidence of significant profit from large scale drug activities by this defendant" to be relevant); *see United States v. Vazquez*, 560 F.3d 461, 473 (6th Cir. 2009) (finding that whether the defendant "received a larger share of the profits" was a relevant factor); *Minter*, 80 F.4th at 758 (same).

Next, Michael Byrd, while in jail, gave Savanna Asberry directions about "continuing distribution activities." He "direct[ed] her activities" and "clearly was giving her directions as to what to do in the case" including "how to continue to distribute, to whom to distribute, how much, and prices." Asberry was "dealing on [Michael Byrd's] behalf." Michael Byrd's exertion of control over his girlfriend, even from jail, in operating his drug-trafficking operation is enough to independently qualify Michael Byrd for the § 3B1.1(c) enhancement.

Lastly, Michael Byrd was "supervising his nephew" Je'Von Byrd for his drug-trafficking operation. Je'Von Byrd stated that Michael Byrd gave him a brick of fentanyl to distribute and that he had never sold drugs before. Je'Von Byrd explained that Michael Byrd was "going to teach" him how to sell the brick of fentanyl that was given to him, and that Michael Byrd "would just guide [Je'Von Byrd] through" the process. The district court credited Je'Von Byrd's testimony and imposed the § 3B1.1(c) enhancement. Considering the evidence, the § 3B.1(c) enhancement was justified.

*E. Reasonable Suspicion*

A stop without reasonable suspicion of criminal activity is unconstitutional. *Terry v. Ohio*, 392 U.S. 1, 27 (1968). To determine whether there was a sufficient degree of suspicion to justify a *Terry* stop, we consider the totality of the circumstances, including the officer's own observations as well as information received from fellow officers, dispatch, and police reports. *United States v. Sheckles*, 996 F.3d 330, 342-43 (6th Cir. 2021); *United States v. Campbell*, 549 F.3d 364, 371 (6th Cir. 2008). This involves "commonsense judgments and inferences about human behavior" as well as an officer's experience about human behavior. *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000); *United States. v. Arvizu*, 534 U.S. 266, 273 (2002). The detaining officers "must have a

particularized . . . basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981).

Reasonable suspicion is not a "finely-tuned standard[]" but an "elusive concept." *Ornelas v. United States*, 517 U.S. 690, 696 (1996); *Cortez*, 499 U.S. at 417. Reviewing courts should not engage in a "divide-and-conquer analysis" but consider factors as a whole. *Arvizu*, 534 U.S. at 274. The degree of suspicion "is obviously less demanding than . . . probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Probable cause itself is "not a high bar" and only requires a "substantial chance of criminal activity." *District of Columbia v. Wesby*, 583 U.S. 48, 49 (2018) (citations omitted).

*1. Relevant Facts*

In March 2021, officers responded to a narcotics overdose. At the scene, Detective Todd Hart contacted an individual at the residence who agreed to be a CI. The CI informed Detective Hart that his supply of narcotics came from a man known as "Bird." The CI went on to describe two vehicles. One of them, the blue Ford Explorer, was ordinarily used by Byrd. The other vehicle was used by Byrd's "romantic partner and the mother of his children." The CI reported, correctly, that this woman was white, blond-haired, and named Savanna. The CI even provided, correctly, the license-plate numbers for the vehicles and specifically described Michael Byrd's primary residence as "a white house on the right as you enter the court with a large tree in front of it" as well as the exact address—365 Woodview Drive in Lexington, Kentucky. Even Michael Byrd could not recall his exact street address. Detective Hart began to surveil that area.

Detective Hart located the residence at the address provided by the CI and found the two vehicles specifically described by the CI in the driveway. Detective Hart then identified Michael Byrd as the registered name attached to the vehicles' license plates, and two people who matched

the descriptions provided by the informant— "Bird" and his partner and co-defendant Savanna Asberry—and saw them entering and exiting the residence with children's car seats. The CI identified a driver's license photograph of Michael Byrd as his supplier and used Michael Byrd's phone number to arrange a controlled purchase of a very large quantity of fentanyl.

Michael Byrd agreed to meet the CI at Apartment #42 at an agreed-upon date and time. Law-enforcement units went to the location with the CI in anticipation of the exchange and of intercepting Michael Byrd. On arrival to the scene, the officers observed a man, "John John," a drug courier for Michael Byrd, enter Apartment #42 and remain inside. The investigators maintained contact with Michael Byrd through the CI, and Byrd indicated that he was five minutes away from the location. Within fifteen minutes, the blue Ford Explorer and a smaller gray sedan parked in front of the driveway at Apartment #42. The Explorer matched the description and license plate number provided by the CI. It was at this point that law-enforcement units prepared to contact the suspects and intercept any narcotics within the vehicles.

Multiple units approached the vehicles. Detective Elizabeth Thomas secured the driver of the Explorer while Detective Brandon Hazelwood approached the side of the vehicle and saw an individual, later identified as Je'Von Byrd, sitting in the front passenger seat. Detective Hazelwood testified that he believed Je'Von Byrd was reaching for a weapon and repeated instructions to Je'Von Byrd to keep his hands visible and to not reach for anything. Detective Thomas then came around to and opened the passenger door. Detective Thomas saw that Je'Von Byrd's pocket was plainly visible and contained a handgun. Je'Von Byrd admitted that it was a handgun. Detective Thomas then did a weapon pat-down to ensure that Je'Von Byrd did not have any additional firearms. She felt a long, rectangular object inside in his jeans and immediately suspected that it

was a brick of narcotics. Detective Thomas enlisted Detective Ross Collins to search Je'Von Byrd's person and Collins quickly located the brick of narcotics.

Officers then searched the Explorer and suspected they would find drugs within the vehicle. The officers located about three kilograms of suspected fentanyl in a backpack in the rear passenger seat. The officers then obtained and executed a search warrant for Apartment #42 and located additional drugs and other evidence of drug trafficking inside.

Je'Von Byrd sought suppression of all evidence seized by police from his person and the car in which he was a passenger on the date of his arrest, and the magistrate judge recommended denial. Je'Von Byrd objected, and the district court overruled the objection and denied the suppression.

*2. Motion to Suppress*

When reviewing an order denying a motion to suppress, we review the district court's legal determinations de novo but will not set aside the district court's factual findings unless they are clearly erroneous. *United States v. Shank*, 543 F.3d 309, 312 (6th Cir. 2008). Whether an officer had reasonable suspicion under the circumstances is a mixed question of law and fact that we review de novo. *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009). We may affirm the district court's decision to deny the motion to dismiss for any reason supported by the record. *United States v. Pasquarille*, 20 F.3d 682, 685 (6th Cir. 1994).

There was overwhelming reasonable suspicion that warranted the stop of the Explorer, and the district court did not err in denying the motion to suppress. As the district court held, reasonable suspicion "clearly" existed and reasonable suspicion, according to the magistrate judge, "readily," "abundant[ly]," and "unequivocally existed." Michael Byrd was not unknown to law enforcement—the CI had identified him, his cars, and his home, and the CI arranged a controlled

purchase and his ultimate take-down. Detective Hart's methodical and investigatory steps all corroborated the key details of the CI's information, including his name, his residence, the license plates of his two vehicles as well as their makes and models, and his description, his partner and co-defendant's description, and the fact that they had young children.

Most importantly, the CI gave accurate predictions of Michael Byrd and his associate's actions on the date at issue, which corroborated his reliability at the time of the stop. Law enforcement monitored the residence after the CI identified it, and the CI cooperated with law enforcement to communicate with Michael Byrd and set up a drug transaction. The CI correctly predicted that Michael Byrd would pull up to the driveway of the correctly identified residence to conduct the drug transaction at the agreed-upon date and time. *see Alabama v. White*, 496 U.S. 325, 332 (noting that "future actions by third parties ordinarily [are] not easily predicted" before concluding that the informant's tip was sufficiently reliable because it accurately predicted that the target would drive to a particular location in a particular vehicle at a particular time).

In sum, more than sufficient suspicion existed to warrant the stop of the Explorer, and the district court's factual findings of this case considering the evidence are not clearly erroneous. The district court's denial of Je'Von Byrd's motion to suppress was appropriate given the circumstances of this case.

**AFFIRMED.**